UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

**RECEIVED**

JUN 1 9 2008

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

AINSWORTH C. JACKSON,　　　:

　　　Plaintiff,　　　　　　:

　　　　　　　　　　　　　　:

　　　　　　　　　　　　　　:

　　　　　　　　　　　　　　:

　　　v.　　　　　　　　　　: Civil Action No. 08-00408(RWR)

　　　　　　　　　　　　　　:

　　　　　　　　　　　　　　:

FEDERAL BUREAU OF PRISONS, :

et. al. Defendants.　　　　:

　　　　　　　　　　　　　　:

.........................:

### PLAINTIFF'S MOTION IN OPPOSITION TO FEDERAL DEFENDANT'S MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT AND PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT

**PLEASE TAKE NOTICE,** that plaintiff, Ainsworth C. Jackson,

pro se, hereby opposes defendant, Federal of Bureau of Prisons

"Motion To Dismiss, or in the alternative For Summary Judgment,"

and moves this honorable court to deny defendant's motion and

grant plaintiff a "Preliminary Injunction and Temporary Restraining

Order," which enjoins defendant, his agents, officers and employees

from forwarding any DNA samples taken from plaintiff on January

31, 2008 for the inclusion in the "Combined DNA Index System

("CODIS")" pursuant to the DNA Analysis Backlog Elimination ACT

(DNA Act), and further enjoins them to remove the "erroneous

information" which defendant Federal Bureau of Prison used in

obtaining a DNA sample of plaintiff and grounds attaches his

"Memorandum of Law In Support."

Respectfully Submitted,

Ainsworth C. Jackson, Pro Se
Reg. No. 19728-101
Rivers Correctional Institution
P.O. Box 630
Winton, NC 27986

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

AINSWORTH C. JACKSON,                 :
         Plaintiff,                   :
                                      :
                                      :
         v.                           :    Civil Action No. 08-00408(RWR)
                                      :
                                      :
FEDERAL BUREAU OF PRISONS,            :
et. al. Defendants.                   :
                                      :
.........................:


**PLAINTIF'S MEMORANDUM OF LAW IN SUPPORT OF HIS MOTION
IN OPPOSITION TO FEDERAL DEFENDANT'S MOTION TO DISMISS
OR, IN THE ALTERNATIVE FOR SUMMARY JUDGMENT**

Pursuant to the Privacy Act, an agency must maintain all records which are used by the agency in making any determination about any individual with such accuracy, relevance, timeliness, and completeness as to assure fairness to the individual in the determination. 5 U.S.C. § 552a(e)(5). An individual may bring suit against an agency which fails to meet this standard. See 5 U.S.C. § 552a(g)(1)(C). In order to recover monetary damages under the Privacy Act, a plaintiff must assert that an agency failed to maintain accurate records, that an 'adverse' determination was made respecting plaintiff. That is, plaintiff must allege inaccurate records, agency intent, causation, and an "adverse determination." Toolasprashad v. Bureau of Prisons, 286 F.3d 576, 583 (D.C. Cir. 2002)(quoting 5 U.S.C. § 552a(g)(1)(C).

Plaintiff has the burden of proving the agencies actions in violating the Privacy Act were intentional or willful. Albright v. United States, 732 F.2d 181, 189 (D.C. Cir. 1984); 5 U.S.C. § 552a(g)(4). To meet this burden, plaintiff "must prove that the offending agency acted" without grounds for believing [its actions] lawful or that it 'flagrantly disregarded the rights guaranteed under the Privacy Act.' Laningham v. United States Navy, 813 F.2d 1236, 1242 (D.C. Cir. 1987).

The Federal Bureau of Prisons promulgated a rule to exempt its system of inmate records from the amendment provisions of the Privacy, 28 C.F.R. § 16.97; See Sellers v. BOP, 959 F.2d 307, 309 (D.C. Cir. 1992), and a rule providing that a PSI is not subject to correction or amendment, 28 C.F.R. § 16.51(c). **However,** pursuant to 28 C.F.R. § 16.97(d), the **"exemption"** of **"Inmate Records"** can be waived by the BOP and was waived by the BOP in their promulgating Bureau of Prisons Policy Statement #5800.11, pages 19 & 20, ¶c (See Plaintiff's Exhibit B) which states:

> c. Inmate Challenge to Information. An inmate may challenge the accuracy of the information in his or her Inmate Central File. Unit Team staff shall take reasonable steps to ensure the accuracy of challenged information, particularly when that information is capable of being verified. The inmate is required to provide staff with sufficient information in support of a challenge (names of persons to contact, government agency, etc. . . ).
>
> When an inmate provides such information, staff shall review the alleged error(s) and take reasonable steps to ensure the information is correct.
>
> For example, if an inmate challenges information in the Presentence Investigation Report (PSI), staff should inform the appropriate U.S. Probation Office (USPO) in writing of the disputed information, and request that a written response also

-2-

be provided.  USPO procedures, however, do not allow for
changes or addendums to be made to the Presentence Investi-
gation Report after sentencing since it is a court document.

If the USPO subsequently reports that the challenged in-
formation, or some part thereof is not accurate, staff shall
attach the Bureau's inquiry and the USPO response to the
applicable section of the Inmate Central file, and also make
a notation on the Inmate Activity Record form (BP-381) to
ensure that future decisions affecting the inmate are not
based on the discredited information.

When the USPO verifies that the information in the PSI is
indeed inaccurate, as claimed by the inmate, staff should
subsequently review, and where indicated, correct Bureau
generated reports or data such as the Inmate Load and
Security  Designation form (BP-337), the Custody Classificat-
ion form (BP-338), Progress Report, and any other reports
that may have been based on the PSI.  Bureau reports, data,
or SENTRY transactions should be corrected within a reasonable
period of time after identification as being inaccurate.

If the information source will provide a corrected document
or data, it should be immediately inserted in the file or
data base and the inaccurate information or document removed.
A notation on the Inmate Activity Record form should acknow-
ledge the insertion of the corrected information or document.

Plaintiff asserts that from the above quoted Bureau of

Prisons Policy Statement #5800.11, it is a self-evident verity

that none of the named defendants herein [Bureau of Prisons,

GEO and Rivers defendants] complied with this policy, and based

on their deliberate, and willful non-compliance with Policy

Statement #5800.11, page 19, 20 ¶c, after plaintiff had made

numerous requests to these defendants that their information

which they were using to classify plaintiff as having to take

a DNA sample was incorrect, was a violation so patently egregious

and unlawful because these defendants knew the conduct they

were undertaking was unlawful.  An agency acts in an "intentional

or willful" manner "either by committing the act without grounds

for believing it to be lawful, or by flagrantly disregarding

-3-

the rights guaranteed under the Privacy Act.  See OMB Privacy
Act Guidelines, 40 Fed. Reg. 28, 948, 28, 964 (1975)(Subsection
(e)(5) "places the emphasis on assuring the quality of the record
in terms of the use of the record in making decisions affecting
the rights, benefits, entitlements, or opportunities . . . .
of the individual").  Buxton v. United States Parole Commission,
844 F. Supp. 642, 644 (D. Or. 1994).

Plaintiff asserts that none of the named defendants ever
attempted to verify the veracity of this disputed information
by either contacting the United States Probation Officer in
the District of Columbia or any other government agency which
could verify whether this disputed information was accurate
and correct.

Based on the foregoing, plaintiff asserts that the Federal
Bureau of Prisons has intentionally and willfully maintained
inaccurate records on plaintiff, and that consequently an adverse
determination was made respecting plaintiff which violated
plaintiff's "Fourth & Fifth Amendments" to the United States
Constitution.

## II.  PLAINTIFF ASSERTS THAT INTERSTATE TRANSPORTATION OF SECURITIES TAKEN BY FRAUD IS NOT A QUALIFYING OFFENSE FOR DNA COLLECTION.

Plaintiff asserts that the federal defendants claim that
based on a May 31, 2007 memorandum from the Rivers Correctional
Institution's Warden to plaintiff, his charge of "Interstate
Transportation of Securities Taken By Fraud" is a "qualifying
offense for DNA collection.  See Federal Bureau of Prison's

-4-

<u>Statement of Material Facts As To Which There Is No Genuine Issue.</u>

Contrary to what defendants Federal Bureau of Prisons and Warden George Snyder allege that "Interstate Transportation of Securities Taken By Fraud" is a qualifying offense for DNA collection, they are both mistaken and plaintiff had sent a letter (See Plaintiff's Exhibit D) to defendant Warden George Snyder dated June 4, 2007 informing him of his error, and no further response from Warden George Snyder was received by plaintiff disputing plaintiff's June 4, 2007 letter.

## A.   <u>PLAIN LANGUAGE OF THE DNA ACT</u>

The DNA Act provides in relevant part that "The Director of the Bureau of Prisons" shall collect a DNA sample from each individual in the custody of the Bureau of Prisons who is, or has been, convicted of a qualifying Federal offense (as determined under subsection (d) of this section) or a qualifying military offense as determined under § 1565 of Title 10.   42 U.S.C. § 14135a(1). Qualifying offense are defined in subsection (d) as follows:

> **(1) The offenses that shall be treated for purposes of this section as qualifying Federal offenses are the following offenses under Title 18, as determined by the Attorney General:**
> **(A) Murder (as described in section 1111 of such title), voluntary manslaughter (as described in section 1112 of such title), or other offense relating to homicide (as described in chapter 51 of such title, sections 1113, 1114, 1116, 1118, 1119, 1120, and 1121).**
> **(B) An offense relating to sexual abuse (as described in chapter 109A of such title, sections 2241 through 2245), to sexual exploitation or other abuse of children (as described in chapter 110 of such title, sections 2251 through 2252), or to transportation for illegal sexual activity (as described in chapter 117 of such title, sections 2421, 2422, 2423, and 2425).**
> **(C) An offense relating to peonage and slavery (as described**

-5-

in chapter 77 of such title).
(D) Kidnapping (as defined in section 359(c)(2)(E) of such title).
(E) An offense involving robbery or burglary (as described in chapter 103 of such title, sections 2111 through 2114, 2116, and 2118 through 2119).
(F) Any violation of section 1153 involving murder, manslaughter, kidnapping, maiming, a felony offense relating to sexual abuse (as described in chapter 109A), incest, arson, burglary, or robbery.
(G) Any attempt or conspiracy to commit any of the above offenses.
(2)   In addition to the offenses described in paragraph (1), the following offenses shall be treated for purposes of this section as qualifying Federal offenses, as determined by the Attorney General:
(A) Any offense listed in section 2332b(g)(5)(B) of Title 18.
(B) Any crime of violence (as defined in section 16 of Title 18).
(C) Any attempt or conspiracy to commit any of the above offenses.

42 U.S.C. § 14135a(d).

Plaintiff asserts that "Interstate Transportation of Securities Taken by Fraud" is not enumerated in any of the "qualifying offenses that are listed and defined in subsection(d) which makes it a "qualifying offense for DNA collection. Furthermore, the chapter of the United States Code which contains the DNA Act significantly is entitled "Violent Crime Control and Law Enforcement." See 42 U.S.C. ch. 136, § 14135a. Because "the title of a statute and the heading of a section are tools available for the resolution of a doubt about the meaning of a statute[,]" Almendarez-Torres v. United States, 523 U.S. 224, 234, 118 S.Ct. 1219, 140 L.Ed.2d 350 (1998)(internal quotations omitted), a chapter title that contains the words "violent crime control" usually signals a provision concerning violent crimes, something that the crime of "Interstate Transportation of

Securities Taken By Fraud" [18 U.S.C. § 2314] is not, a crime
of violence, nor is it a "qualifying offense for DNA collection.
Therefore, the Federal, GEO Group, Inc. and Rivers defendants all
violated plaintiff's "Fourth Amendment Rights" to the United States
Constitution with their "Illegal Search & Seizure" in forcing
plaintiff to provide them with a "DNA sample for inclusion into
the "Combined DNA Index System (CODIS) on January 31, 2008,
because plaintiff was not subject to DNA sample collection based
on his conviction for "Interstate Transportation of Securities
Taken By Fraud." 18 U.S.C. § 2314.

III.  **THE STANDARD FOR PROVING A CIVIL CONSPIRACY**

To state a claim under 42 U.S.C. § 1985(3), a plaintiff must
allege: (1) a conspiracy involving two or more persons; (2)
for the purpose of depriving, directly or indirectly, a person
or class of persons of the equal protection of the laws; (3) an
act in furtherance of the conspiracy; and (4) causes injury
to a person or property, or a deprivation of any right or
privilege of a citizen of the United States.  Hilliard v. Ferguson,
30 F.3d 649 (5th Cir. 1994).

A civil conspiracy is an agreement between two or more
persons to injure another by unlawful action.  Express agree-
ment among all the conspirators is not necessary to find the
existence of a civil conspiracy.  Each conspirator need not
have known all of the details involved.  All that must be shown
is that there was a single plan, that the alleged co-conspirator
shared in the general conspiratorial objective, and that an

-7-

overt act was committed in furtherance of the conspiracy that caused injury to the complainant.    Hooks v. Hooks, 771 F.2d 935.

The Federal Bureau of Prisons defendant cannot now attempt to down-play that they had "conspired" with the GEO/Rivers defendants to deprive plaintiff of his "Fourth Amendment Rights against "Illegal Searchs & Seizures" when the Federal Bureau of Prisons (FBOP) defendant knew that J.E. Harrell, the FBOP employee's (deceased) name signed on two of plaintiff's "Administrative Remedies" request, as the "Privatization Manage- ment Branch Administrative Remedy Coordinator for the Federal Bureau of Prisons had been dead since the year 2000, and that they had no intentions of investigating the accuracy of the disputed information which plaintiff was disputing in reference to whether plaintiff had been convicted of a "qualifying offense" that required plaintiff to provide a DNA sample.  In furtherance of this conspiracy, these defendants knew that once this issue raised by plaintiff was denied at the Rivers Correctional Institution, it would never be investigated by the J.E. Harrell, the alleged Bureau of Prisons Administrative Remedy Coorindator for the Privatization Management Branch because J.E. Harrell had been deceased since the year 2000.  This on-going conspiracy began against plaintiff in the year 2005 to deprive plaintiff of his constitutional rights and continued on into the years 2007 and 2008, by signing the name of a deceased employee, J.E. Harrell to plaintiff's "Administrative Remedy Rejection Notices,"

-8-

sending them to defendants GEO/Rivers and having Mr. J. Alexander
a employee of the Rivers Correctional Institution, delivery
these rejection notices to plaintiff and have plaintiff sign
for each one.

Plaintiff asserts that someone purposely misrepresented
themselves as being J.E. Harrell, the Administrative Remedy
Coordinator for the Privatization Management Branch for the
Federal Bureau of Prisons, and signed J.E. Harrell's name to
plaintiff's "rejection notices" which were in reference to whether
plaintiff had to provide a DNA sample before being released from
prison . Whoever this individual was, knew that his/her actions
were unlawful.

The GEO/Rivers defendants played a significant part in the
conspiracy (See Plaintiff's Exhibit B-1 & 2) because on two
separate occasions, they followed the instructions of the Federal
Bureau of Prisons defendant and hand delivered "Rejection Notices"
issued by a "deceased employee," "J.E. Harrell," which were
remedies which plaintiff had sought in reference to plaintiff's
contesting that he had to provide a DNA sample and that law
enforcement agencies had to be notified once plaintiff was released
from prison, these defendants also knew that their actions were
unlawful.

Plaintiff asserts that the GEO/Rivers defendants shared in
the conspiracy as is charged by plaintiff by their express agree-
to carry out the unlawful actions which they were instructed to

-9-

by the Federal Bureau of Prisons defendant in furtherance of the
conspiracy that caused injury to plaintiff.  See Hobson v. Wilson,
737 F.2d 1, 51-52 (D.C. Cir. 1984), cert. denied, 105 S.Ct. 1843;
Hampton v. Hanrahan, 600 F.2d 600, 620-21 (7th Cir. 1979).  See
Fitzgerald v. Seamans, 553 F.2d 220 (D.C. Cir. 1977)(White House
official may be liable in section 1985(3) action).

## IV.   PLAINTIFF'S FOURTH & FIFTH AMENDMENT CONSTITUTIONAL CLAIMS.

The Fourth Amendment provides in relevant part that "[t]he
right of the people to be secure in their persons, houses, papers,
and effects, against unreasonable searches and seizures, shall
not be violated."  U.S. Const. amend. IV.  The forced extraction
of blood constitutes a **"search"** under the Fourt Amendment.
See Skinner v. Railway Labor Executives' Association, 489 U.S.
602, 616, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989)(stating that
"it is obvious that this physical intrusion, pentrating beneath
the skin, infringes an expectation of privacy that society is
prepared to recognize as reasonable.  The ensuing chemical
analysis of the sample to obtain physiological data is a further
invasion of [the individual's privacy interest)("We have long
recognized that a compelled intrusion into the body for blood
to be analyzed for alcohol content must be deemed a Fourth
Amendment search)."  See also Winston v. Lee, 470 U.S. 753,
760, 105 S.Ct. 1611 (1985); Schmerber v. California, 384 U.S.
757, 767-68, 86 S.Ct. (1966).  The Fourth Amendment, however,
protects against only those searches that are deemed unreason-
able.  See id. at 619, 109 S.Ct. 1402.  A determination of
whether a search is unreasonable "depends on all of the cir-

-10-

cumstances surrounding the search . . .and the nature of the search ... itself." Id. (quoting United States v. Montoya de Hernandez, 473 U.S. 531, 537, 105 S.Ct. 3304, (1985).

Plaintiff asserts that pursuant to the DNA Analysis Blacklog Elimination Act of 2000, 42 U.S.C.A. § 14135a(a)(1)(d) authorizes the Director of The Federal Bureau of Prisons to collect a DNA sample from each individual in the custody of the Bureau of Prisons who is, or has been, convicted of a qualifying Federal offense (as determined under subsection (d) of this section) or a qualifying military offense, as deterined under section 1565 of Title 10.

Plaintiff asserts that none of his convictions in the past, or present were or are "qualifying federal offenses as determined under subsection (d) of the DNA Analysis Blacklog Elimination Act of 2000, 42 U.S.C.A. § 14135a(a)(1)(d), and therefore, the forced extraction of blood from plaintiff by these defendants was a clear violation of his Fourth Amendment Rights which amounted to an **"Illegal Search & Seizure."**

Finally, plaintiffs asserts that the level of procedural safeguards that must afforded before the government may deprive an individual of a protected interest is determined by reference to: (1) the private interest at stake; (2) the risk of error inherent in the use of one form of procedure over another; and (3) the interest of the government. Matthews v. Eldridge, 424 U.S. 319, 335 (1976). The procedural safeguards that are required when an individual's liberty is at stake must at least equal

-11-

those required before he may be deprived of his property, even
when the individual's liberty already is curtailed by the fact
of being incarcerated in a correctional facility.  Wolff v.
McDonnell, 418 U.S. 539, 558 (1974).

Allegations of procedural "Due Process" violations by
certain individual government employees, as opposed to direct
challenges to government procedures or lack thereof, have long
been accepted as constituting governement action forming the
basis for a claim under the "civil rights statutes."  See e.g.,
Monroe v. Pape, 365 U.S. 167, at 172; Home Tel. & Tel. Co. v.
Los Angeles, 227 U.S. 278, 282-85; Mansell v. Saunders, 372
F.2d 573, 576 (5th Cir. 1967).  The requirements of the "due
process clauses are directed specifically to the federal, state
and District of Columbia governments.  They require the promulga-
 tion of laws and regulations providing for regular procedures
which the government must follow before it may deprive an
individual of life, liberty or property.  The execution of those
laws and regulations also must conform to due process; otherwise,
the due process clause, with its guarantees of regular and
predictable procedures, becomes a cipher.  It is beyond cavil
that due process requires more than the mere promulgation of
laws and regulations which, if followed, would preserve the
most fundamental of rights.

In Parratt v. Taylor, 451 U.S. 527, the United States
Supreme Court based its decision, in part, on the fact that:
the deprivation occurred as a result of the unauthorized failure

of agents of the State to follow established state procedure."
Parratt, supra, 451 U.S. at 543.   Such occurrences have happened
in plaintiff's case; the Federal Bureau of Prisons, GEO and
the Rivers defendants all have failed to follow the DNA Analysis
Blacklog Elimination Act of 2000, 42 U.S.C. § 14135a(a)(1)(d);
Bureau of Prisons Policy Statements Numbers, #5800.11, pages
19 & 20, ¶c; #5110.15; and #5162.02, and denied plaintiff his
rights under the "Due Process Clause" of the Fifth Amendment
to the United States Constitution.

## V.   THE FEDERAL BUREAU OF PRISONS IS SUBJECT TO JUDICIAL REVIEW OF AGENCY ACTIONS WHICH VIOLATE THE PRIVACY ACT, THE 4TH & 5TH AMENDMENT DUE PROCESS CLAUSE AND THE ACCARDI DOCTRINE.

Plaintiff has brought his suit under the section 10(a)
of the Administrative Procedure Act, 5 U.S.C. § 702.   To establish
standing to sue here, plaintiff must demonstrate that he has
been "adversely affected or aggrieved by agency action within
the meaning of a revelant statute.

The APA directs courts to review agency actions under a
deferential standard.   Carabell v. U.S. Army Corp. of Eng'rs,
391 F.3d 704, 707 (6th Cir. 2004); Northeast Hhio Reg. Sewer
Dist. v. Env't Prot. Agency, 411 F.3d 726, 731 (6th Cir. 2005).
A court may not set aside or hold unlawful an agency action
unless that action is arbitrary, capricious, an abuse of dis-
cretion or otherwise not in accordance with law.   5 U.S.C. §
706(2)(A); An agency decision is arbitrary and capricious if
the agency fails to examine relevant evidence or articulate
satisfactory explanation for the decision.   Motor Vehicle Mfrs.

Ass'n v. State Farm Mut. Auto Ins. Co., 463 U.S. 29, 42-43,
103 S.Ct. 2856 (1983).  The reviewing Court "may not supply
a reasoned basis for the agency's action that the agency itself
has not given." Id. at 43, 103 S.Ct. 2856.  In addition to
arbitrary and capricious review, the APA authorizes courts to
review agency actions for conformity with law.  5 U.S.C.
§ 706(2)(A).

        Section 10 of the APA grants all parties "adversely affected
or aggrieved" to obtain judicial review of agency actions that
allegedly violate federal statutes.  5 U.S.C. § 702.  Section
10 of the APA grants all parties "adversely affected or aggrieved
by a final agency action prudential standing to bring suit in
federal court." Ghaly v. INS, 48 F.3d 1426, 1434 n. 6 (7th
Cir. 1995).  A person is "adversely affected or aggrieved" within
the meaning of the APA if his or her claim meets the "zone of
interest test." Nat'l Credit Union Admin. v. First Nat'l Bank,
522 U.S. 479, 487-90, 118 S.Ct. 927 (1998).  To meet the re-
quirements of the "zone of interest test," a plaintiff must
establish that the interest he or she seeks to protect, "is
arguably within the "zone of interests to be protected by the
statute," under which plaintiff sues.  Nat'l Credit Union
Admin., 522 U.S. at 492, 118 S.Ct. 927.  The Supreme Court has
repeatedly emphasized that the "zone of interest test" does
not require a plaintiff to establish that Congress specifically
intended to benefit the plaintiff.  Id., See also Clark v.
Securities Indus. Ass'n, 479 U.S. 388, 399-400, 107 S.Ct. 750
(1987)(["[t]he zone of interest test is a guide for deciding

-14-

whether, in view of Congress' evident intent to make agency
action presumptively reviewable, a particular plaintiff should
be heard to complain of a particular agency decision.  The test
is not meant to be especially demanding; in particular, there
need be no indication of Congressional purpose to benefit the
would-be plaintiff.")  Courtney v. Smith, 297 F.3d 455, 461
(6th Cir. 2002).  Rather, the **"zone of interest test"** entails
a two party inquiry.  First, the court must determine what
interests the statute arguably was intended to protect, and
second, the Court must determine whether the plaintff's interests
affected by the agency action in question are among them."
Nat'l Credit Union Admin., 522 U.S. at 492, 118 S.Ct. 927; see
also Courtney, 297 F.3d at 461.

In this case, plaintiff's interest falls under the Privacy
Act, 5 U.S.C. § 552a, the Fourth & Fifth Amendments to the United
States Constitution, and thus, plaintiff has a "prudential
standing" to sue under the APA.

Finally, Congress expressly contemplated declaratory actions
to challenge the provisions that administrative policies affect-
ing individual rights and obligations so as to avoid the
inherently arbitrary nature of **"ad hoc determinations."**  It
appears that Congress evinced to allow suits like the one before
this Court by way of an action for declaratory judgment.  Further-
more, this Court has jurisdiction under the mandate of § 10(a)
of the Act, 5 U.S.C. § 702, which states:

> **"a person . . . adversely affected or aggrieved by agency
> action . . . is entitled to judicial review thereof; the**

-15-

provision of Section 10(b), 5 U.S.C. § 703, that the form
of legal action, including actions for declaratory judgment
or writs of prohibitory or mandatory injunction, in a court
of competent jurisdiction; and the requirement of Section
10(e) 5 U.S.C. § 706, that the "reviewing court shall . . .
(2) hold unlawful and set aside agency action, findings and
conclusions found to be . . . (d) without observance of
procedure required by law."

Article III standing requires that a plaintiff suffer injury
in fact that is fairly traceable to the defendant's illegal
conduct and redressable by the requested relief. Allen v.
Wright, 468 U.S. 737, 750, 104 S.Ct. (1984). Plaintiff
does allege an injury-in-fact that is traceable to the Federal
Bureau of Prisons, GEO and Rivers defendants denial of plain-
tiff's "Fourth & Fifth Amendment Rights" to the United States
Constitution. The denial deprived plaintiff of a right to be
free from an "Illegal Search & Seizure, and Due Process of
Law."

In sum, the facts alleged in plaintiff's "Complaint & Motion
In Opposition" to the Federal Bureau of Prisons "Motion To Dismiss,
the deprivation of plaintiff's Privacy Act, Fourth & Fifth
Amendment Rights which are neither random nor authorized by the
Federal Bureau of Prisons or GEO/Rivers defendants, and as such,
the Federal Bureau of Prisons, through its agent, GEO/Rivers
defendants were all obligated by the DNA Analysis Blacklog
Elimination Act of 2000, 42 U.S.C.A. § 14135a(a)(1)(d), the Fourth
and Fifth Amendments to the U.S. Constitution, not to force
plaintiff to provide a DNA sample for the inclusion into the
"Combined DNA Index System (CODIS).

-16-

**WHEREFORE,** in light of the aforementioned, plaintiff respectfully moves this honorable Court to deny the Federal Bureau of Prisons "Motion To Dismiss or in the alternative, For Summary Judgment.

Respectfully Submitted,

*Ainsworth C. Jackson*

Ainsworth C. Jackson
Reg. No. 19728-101
Rivers Correctional Institution
P.O. Box 630
Winton, NC 27986

### CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing "Motion In Opposition and Memorandum of Law In Support," has been mailed this **17th** day of **June 2008** to the following:

1. Deborah J. Israel, Esq.
   Womble Carlyle Sandridge & Rice, PLLC
   1401 Eye Street, N.W., 7th Floor
   Washington, D.C. 20005
   Attorney for GEO & Rivers defendants

2. Fred E. Haynes, AUSA
   555 4th Street, N.W. Room E-4110
   Washington, D.C. 20530
   Attorney for the Federal defendant

Pursuant to 28 U.S.C. § 1746, I declare under the penalty of perjury that the statements made herein are true and correct and made to best of my knowledge and belief.

**Executed on this 17th day of June 2008.**

-17-

Ainsworth C. Jackson

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

AINSWORTH C. JACKSON,                    :
                                         :
          Plaintiff,                     :
                                         :
                                         :
                                         :
               v.                        :
                                         :   Civil Action NO. 08-00408(RWR)
                                         :
                                         :
FEDERAL BUREAU OF PRISONS,  :
et. al.,  Defendants.                    :
                                         :
.........................:

### ORDER

    Upon consideration of the motion to dismiss or, in the alternative, for summary judgment filed by the Federal Bureau of Prisons, and the entire record of this case, it is hereby

    **ORDERED** that the Federal Bureau of Prisons motion to dismiss or, in the alternative, for summary judgment be hereby **DENIED** in its entirety.

_____
Richard W. Roberts
U.S. District Court Judge

**E X H I B I T   B**



**U.S. Department of Justice**
Federal Bureau of Prisons

# Program
# Statement

**OPI:** CPD
**NUMBER:** 5800.11
**DATE:** September 8, 1997
**SUBJECT:** Inmate Central File, Privacy
Folder, and Parole Mini-Files

1.  <u>PURPOSE AND SCOPE</u>.  The Bureau of Prisons maintains complete
information on all inmates confined in Bureau institutions.
Staff use the Inmate Central File, Privacy Folder, and Parole
Mini-file to maintain pertinent information regarding a detainee,
unsentenced and sentenced offenders.

The Bureau of Prisons has had numerous policy sources on all
facets of the Inmate Central File System.  This Program Statement
consolidates many of these sources for easier reference.  This
issuance sets forth guidelines in the following areas:

a.  Inmate Record Functions,
b.  Inmate Central Files,
c.  Standardization of Inmate Central File Material,
d.  Maintenance, Security, and Access Responsibilities and
    Procedures,
e.  Routine Uses of Inmate Central File,
f.  Disclosure of Inmate Central File Materials,
g.  Inmate Review of Inmate Central File,
h.  Documentation of Oral Disclosure,
i.  Transfer of Records Between Bureau Facilities,
j.  Requests for Forwarding of Inmate Files,
k.  Retirement of Inmate Central File, and
l.  Parole Mini-files.
m.  Pretrial Inmate File Material/Immigration & Naturalization
    Service (INS) Detainees

2.  <u>PROGRAM OBJECTIVES</u>.  The expected results of this program
are:

a.  Inmate files will be maintained with complete information
on each inmate confined in a Bureau of Prisons institution.

b.  U.S. Parole Mini-Files will be completed and accessible to
the U.S. Parole Commission for all inmates specified in this
Program Statement.

accountability procedures; likewise, if the file is maintained in
the unit, the unit will account for the file folders according to
unit accountability procedures.  In either situation,
accountability procedures shall be established and outlined in
the Institution Supplement.

Staff shall adhere to the general requirements concerning the
handling of inmate files addressed in this Program Statement.
Pretrial file material shall include any documentation normally
retained for a sentenced inmate.  FOI Exempt material shall be
placed in the drop file folders appropriately stamped "FOI
Exempt."

6.  <u>DETAINEES (INS)</u>.  Institution staff shall maintain the Inmate
Central File on an inmate who completes his/her sentence and is
reclassified as an INS detainee.  The existing Inmate Central
File shall incorporate any documents accumulated during his/her
status as an INS detainee.  The existing Inmate Central File
shall be maintained active until the inmate is removed from the
institution by INS officials.

For inmates who are initially classified as INS detainees and
therefore have had no previous Inmate Central File created,
institution staff shall adhere to Section 5 (Pretrial Procedures)
of this Program Statement on specific instructions on file
materials for INS detainees.  The Institution Supplement shall
address the location of the files and establish file
accountability procedures.

6.  <u>WITNESS SECURITY FILES</u>.  Because of the sensitivity of
Witness Security Cases, procedures for handling these files may
differ.  For specific instructions refer to the Central Inmate
Monitoring Manual and/or the Protective Custody Unit Manual.

7.  <u>INMATE RECORD FUNCTIONS</u>.  Many inmate administrative and
clerical functions are appropriately performed in the unit while
others are appropriately performed in the ISM Department.
Normally, the functions of Central Files, Privacy Folder, and
mini-files created for use by the U.S. Parole Commission are
separated by Unit Staff/ISM Staff responsibilities in the
following manner.

    a.  <u>Unit Functions</u>

- Create Inmate Central Files,
- Create Privacy Folder,
- Maintain Inmate Central File,
- Monitor the filing/security of Inmate Central File, and
- Create Parole Mini-files.

3.  <u>DIRECTIVES AFFECTED</u>

   a.  <u>Directive Rescinded</u>

     PS 5800.09     Inmate Central File, Privacy Folder and
                            Parole Commission Files (7/21/93)

   b.  <u>Directives Referenced</u>

     PS 1330.13     Administrative Remedy Program (12/22/95)
     PS 1351.04     Release of Information (12/5/96)
     PS 5100.06     Security Designation and Custody
                            Classification Manual (6/7/96)
     PS 5180.04     Central Inmate Monitoring System (8/16/96)
     PS 5310.12     Psychology Services Manual (8/30/93)
     PS 5321.06     Unit Management (7/31/96)
     PS 5800.07     Inmate Systems Management Manual (12/24/91)
     PS 7331.03     Pretrial Inmates (11/22/94)

     TRM 5802.01    SENTRY General Use Technical Reference Manual
                           (06/01/94)

     Federal Register, Volume 41, Number 181 (9/16/76)

4.  <u>STANDARDS REFERENCED</u>

   a.  American Correctional Association 3rd Edition Standards for
Adult Correctional Institutions:  3-4092, 3-4093, 3-4095,3-4096,
3-4233, 3-4234.

   b.  American Correctional Association 3rd Edition Standards for
Adult Local Detention Facilities:  3-ALDF-1E-05, 3-ALDF-1E-01,
3-ALDF-1E-02, 3-ALDF-1E-04, 3-ALDF-1E-05, 3-ALDF-1E-06, 3-ALDF-
IF-08, 3-ALDF-3C-19, 3-ALDF-3C-20.

   c.  American Correctional Association 2nd Edition Standards for
Administration of Correctional Agencies:  2-CO-1E-01, 2-CO-1E-02,
2-CO-1E-03, 2-CO-1E-04, 2-CO-1E-06, 2-CO-1E-07, 2-CO-1E-08,
2-CO-1E-09.

   d.  American Correctional Association Standards for Adult
Correctional Boot Camp Programs:  1-ABC-1E-04, 1-ABC-1E-05, 1-
ABC-1E-06, 1-ABC-1E-07, 1-ABC-1E-08, 1-ABC-3C-13.

5.  <u>PRETRIAL PROCEDURES</u>.  File materials for pretrial inmates
shall be kept in letter size, straight cut, drop file folders.
The location of the folders shall be identified in the local
Institution Supplement at the Warden's discretion.  Depending on
where the pretrial file is maintained will determine the
appropriate accountability procedures.  For example, if the file
is maintained in Inmate Systems Management (ISM), ISM will
account for the file folders according to the ISM Department

b.  Inmate Systems Management Functions

* Coordinate movement of Central Files/Central File
  material to units,
* Interagency transfer of files, and
* Retirement and retrieval of inactive files.

c.  Regional Inmate System Functions

* Create and maintain State concurrence Central Files.

d.  Community Corrections Managers Functions

* Create and maintain Inmate Central Files on Federal
  inmates being boarded in state facilities (State
  Boarders).

8.  INMATE CENTRAL FILE

a.  Documents File.  Part of the Inmate Central Records System
is defined in the Federal Register, September 16, 1976, Volume
41, No. 181, page 39918.

b.  Creation.  Each Unit Secretary shall review the SENTRY
Daily Log for unit assignments and create the Inmate Central File
and Privacy Folder immediately after the assignment to a housing
unit at the institution to which the inmate has been designated.
Inmates who have been previously classified and who are
subsequently transferred from other Bureau institutions
ordinarily shall not require creation of another Inmate Central
File.  Former files on individuals recommitted under the same
sentence shall be reactivated.

The six-position Inmate Central File Folder shall be used,
along with a pressure-sensitive label.  Tattered or torn file
folders should be replaced.  The General Services Administration
currently supplies the Inmate Central File Folder.  Specific
details and ordering instructions may be obtained from the
institution Business Office.

c.  Location.  The Inmate Central File is maintained at the
current or last institution or facility of confinement.  Once the
inmate has been released, refer to the Inmate Systems Management
Manual for further instructions.

d.  Categories of Individuals Covered.  Current and former
sentenced inmates under the custody of the Attorney General of
the United States to include Study and Observation cases.

e.  Organization.  The six-position Inmate Central File folder
provides for the organization of filed material, topically, as
follows:

PS 5800.11
CN-01 12/31/97
Page 5

**Section No.**          **Topic**

     1.          Sentence Data/Detainers/IFRP
     2.          Classification/Parole Material
     3.          Mail, Visits, and Property, etc.
     4.          Conduct, Work and Quarters Reports
     5.          Release Processing
     6.          General Correspondence

In addition, a Privacy Folder, attached to the top of Section 5, provides a receptacle for storing Freedom of Information Act (FOIA) Exempt material.  The department responsible for ordering Privacy Folder inserts shall consult the institution Business Office to ensure proper procedures are followed.

    f.  Standardization of Inmate Central File Material.
Standardization streamlines the filing of material, expedites accessibility and retrieval of data, and eliminates the need to rearrange files of inmates transferring into the unit.

    (1)  Responsibilities.  All institutions shall comply with the standardized system for organizing material in the Inmate Central File and Privacy Folder.

    Unit Managers are ordinarily responsible for ensuring all Inmate Central Files and Privacy Folders are organized as stated herein.  At institutions retaining a centralized file system, the Warden shall designate staff accountable for standardized filing of material.

    (2)  Requirements.  Detailed instructions for the order of routine filing are included in Section 9 of this Program Statement, with the filing of FOIA Exempt materials in the Privacy Folder detailed in Section 10.

    (3)  Storage.  Files shall be stored alphabetically.

    g.  Multiple Volumes.  When it becomes necessary to establish a second volume of an inmate's Central File, the second volume shall be created containing all the original core documents required for an initial file.

(1)  Core Documents.  Core documents shall include:

      (a)  CIM White Card
      (b)  Intact FOIA Exempt section from primary volume
      (c)  J&C
      (d)  PSI
      (e)  Chronological Disciplinary Record for Incident
          Reports written before December 1, 1990.

(2)  <u>Privacy Folder</u>.  A new Privacy Folder shall not
ordinarily be re-created.  Staff shall remove the FOI Section
from the preceding volume and insert it in the newly created
volume.

(3)  <u>Controls</u>.  Multiple volumes shall be clearly identified on
the check-out cards, file tabs, and on the file cover (i.e.,
Volume I of III, Volume II of III, etc.)

- A Check-out Card (BP-387) shall be used for each
  volume.

- If all volumes of multiple files are not maintained in
  the regular Central File cabinet, the current volume is
  to be marked as to the location of the other volume(s).

- Each **volume** shall be accounted for daily.  Thus the
  total file count will exceed the inmate count when
  multiple volumes exist.

- At the beginning of each month, a list of inmates with
  multiple volume files is to be included on the file
  count record noting the number of volumes.  Addition
  and deletion of files and volumes of files will then be
  noted on the file count record for the remainder of
  that month.

- Multiple volume files shall be created chronologically,
  maintaining the six-position file's order.

9.  <u>INMATE CENTRAL FILE ORDER</u>.  The six-position Inmate Central
File provides for the organization of filed material.  Material
shall be filed in the following order in the Inmate Central File
(top to bottom) by sections when the document, report, etc. is
appropriate, available, and disclosable to the inmate.

   a.  <u>Section One:  (Sentence Data/Detainers/Inmate Financial
Responsibility Program)</u>

*
(1)  CIM White Card                                              *
(2)  SENTRY Sentence Computation Record (most current)
(3)  Copy of Judgment in a Criminal Case or Judgment and
     Commitment Papers (all)
(4)  Financial Responsibility SENTRY Module Contract (most
     current)

   (a)  Installment Schedule Agreement for Unpaid Fines form
        (if applicable)
   (b)  Cost of Incarceration Fee form (BP-546) (if
        applicable)
   (c)  Correspondence relating to IFRP
        i.e. (BP-445's, Financial Litigation Unit
        Correspondence)

   (5)   Extra Good time Recommendation (BP-390) (all)
   (6)   Statutory Good Time Action Notice (BP-389) (all)
   (7)   Good Conduct Time Action Notice (BP-448) (all)
   (8)   Detainer Action Letter (BP-394) (all)
   (9)   Interstate Agreement on Detainer forms (BP-235
       through 239) (copy, if applicable)
 (10)   FBI Fingerprint Report (RAP Sheet) or request for RAP
       Sheet; no Bureau run NCIC/III records in disclosable
       portion of File
 (11)   Disclosable AO-235/AO-245/USA-792, (with response, if
       applicable)

b.   <u>Section Two:  (Classification and Parole Materials)</u>

   (1)   Inmate Activity Record form (BP-381); new form for each
       institution (all)
   (2)   In-Transit Data form (most current)
   (3)   Copy of Transfer Order (BP-399) (all)
   (4)   Copy of Redesignation Approval, SENTRY Clearance Data –
       no separatees listed (most current)
   (5)   Request for Transfer (all)
   (6)   Request for Management Variable Application/Updated
       Expiration Date or PSF Waiver (all)
   (7)   Custody Classification form (most current; all
       exception cases resulting in custody reductions)
   (8)   Parole forms (in chronological order) (all)

     (a)   Parole Commission Appeals, National/Regional
     (b)   Notice of Action
     (c)   Notice of Action, Part II-Salient Factor
     (d)   Waiver of Notice, Representation or Disclosure Staff
        Representative form
     (e)   Notice of Hearing
     (f)   Parole Application/Waiver (I-24)
     (g)   Background Statement of Inmate (I-32)
     (h)   Attorney Witness Election forms (I-16) and (CJA 22)

   (9)   Related Correspondence to Parole Commission (all)

     (a)   Parole Violation Warrant Application
     (b)   USPO packet excluding duplication

 (10)   Most current Progress Report
 (11)   Classification Material

       Program Review forms (BP-191) (6 most current)

 (12)   Treaty Transfer Packet (copy, if applicable)

     (a)   Transfer Inquiry form (BP-297) (if applicable)
     (b)   Treaty Transfer Case Summary (if applicable)

(13)  Executive Clemency Report (if applicable)
(14)  Request for PSI (U.S. District Courts Only)
(15)  Security Designation form (BP-337)
(16)  Presentence Investigation Report (PSI) (U.S. District
      Courts Only)/Probation Violator Report
(17)  Correspondence relating to PSI (disclosable)

c.  Section Three:  (Mail, Visits, Property, etc)

(1)  Extra Photographs, stored in envelope (most current)
(2)  Social Security Card, Drivers License, etc.
     (stored in envelope; send to R&D upon release)
(3)  Approved Visiting List (most current)
(4)  Correspondence relating to Visiting List (disclosable)
(5)  Telephone List (most current since the last Program
     Review)
(6)  Telephone Number Request form (BP-505) (all)
(7)  Correspondence relating to Telephone List (disclosable)
(8)  Inmate to Inmate Correspondence Approvals (all)
(9)  Acknowledgment of Inmate (BP-407/408) (all)
(10)  Inmate Personal Property Records (BP-383) (all)
(11)  Confiscation & Disposition of Contraband forms (BP-402)
      (all)
(12)  Commissary Issue Card form (most current)
(13)  Request/Authorization to Mail Inmate Packages (BP-329)
      (maintain for two years)
(14)  Authorization to Receive Packages or Property (BP-331)
      (maintain for two years)
(15)  Injury Report - Inmate  (BP-S140.016) (all)
(16)  Uniform Basic Safety Regulations (BP-169) (most
      current)
(17)  Institution AIDS Training (most current)
(18)  Admission and Orientation Program Checklist (all)
(19)  Intake Screening form/(Rights & Responsibilities (all)
(20)  Medical/Psychology Intake Screening Form (BP-354) (all)

d.  Section Four: (Conduct, Work, Quarters Reports, etc)

(1)  Chronological Disciplinary Record for Incident Reports
     written prior to December 1, 1990
(2)  Incident Reports, UDC Actions (all)
(3)  Discipline Hearing Officer Packet; file each UDC/DHO
     action as a packet in chronological order (all)

(a)  Incident Report (BP-288)
(b)  Inmate Rights at Discipline Hearing (BP-293)
(c)  Notice of Discipline Hearing Before the DHO (BP-294)
(d)  Duties of Staff Representative (BP-306)
(e)  Waiver of Appearance (BP-307)
(f)  Discipline hearing Officer (DHO) Report (BP-304)
(g)  DHO Checklist (BP-447)
(h)  Administrative Detention Order (BP-308)
(i)  Special Housing Unit Record (BP-292)
(j)  Special Housing Review (BP-295)

         (k)   Temporary Placement in Disciplinary Segregation
              Order (BP-321), including any supporting disclosable
              documentation

     (4)   Work Performance Rating forms, UNICOR and IPP (purged
          after incorporated into the inmate's progress report)
     (5)   Request for Vacation (most current)
     (6)   Education Data

         (a)   Education Data Transcript (most current)
         (b)   High School Diploma or proof of its attainment GED
         (c)   V/T Certificates (all)
         (d)   Other Education Related Documents

     (7)   Drug Abuse Program correspondence (most current
          on top)

e. <u>Section Five:  (Release Processing)</u>

     (1)   Institution/Unit Release Preparation Checklists (most
          current)
     (2)   Program Review Report (BP-571) (if applicable; original
          report regarding Notification of Prisoner Release)
     (3)   Notification of Community Treatment Programs form (if
          applicable)
     (4)   USPO Plan Approval (most current)
     (5)   Parole Certificates, Parole form (H-13) (all)
     (6)   Parole Certificate Request form (most current)
     (7)   Release Correspondence (Pre-release progress report
          receipts) (most current)
     (8)   Notice of Release and Arrival, Parole form (I-13) (all)
     (9)   Deportation Notice (Parole form 55) (all)
   (10)   Supervision Release Plan form (BP-522) (all)
   (11)   Inmate Education Data Transcript (most current)
   (12)   Certificate of Mandatory Release, Mandatory Release to
          Special Parole, Special Parole or Court Designated
          Parole (Parole form I-33) (all)
   (13)   Release Authorization (BP-392) (all)
   (14)   Gratuity forms (BP-189 or BP-379) (most current)
   (15)   Notification of Prisoner Release Form (if applicable)
   (16)   Release of Immigration Detainee with Supervision to
          follow (BP-325) (all)
   (17)   Conditions of Probation and Supervised Release,
          (Probation form 7A) (if applicable)
   (18)   CCC Terminal Report (if applicable)
   (19)   CCC Packet (most current)

         (a)   Furlough Approval and Record form (BP-291) (CCC Only)
         (b)   Institution Referral for CCC Placement (BP-210)
         (c)   Acceptance/Denial Documentation from CCM
         (d)   Exception Memorandum from Warden done prior to
            April 30, 1993.

   (e) Exclusion memorandum from the Warden with rationale
     for exclusion from CC programs/Inmates refusal to
     participate in CC programs memorandum
   (f) Medical Evaluation for CCC Placement (BP-351)
   (g) Community Based Program Agreement

  (21) Prior Release Documents (file entire packet together)

 f. Section Six: (General Correspondence) - Chronological

  (1) Correspondence, General
  (2) Furlough Packet (all)

   (a) Furlough Questionnaire USPO (BP-302)
   (b) Furlough Questionnaire
   (c) Furlough Approval form (BP-291)
   (d) Correspondence Regarding Furlough
   (e) Furlough Evaluation

  (3) Record of Escorted Trip (most current)
  (4) Inmate Request to Staff Member (BP-148) (all)
  (5) Congressional Correspondence - Entire Packet (all)
  (6) Consent forms - General (all)

 Note: No Administrative Remedy Responses should be
maintained in the Inmate Central File.  See the Program Statement
on the Administrative Remedy Program for file maintenance.

10. PRIVACY FOLDER.  The Privacy Folder is to be located on the
top of Section 5 of the Inmate Central File.  The Privacy Folder
contains two sections.

 • FOIA Exempt material for Section I shall include Central
  Inmate Monitoring documents and Victim/Witness
  Information.

 • Section II shall include other non-disclosable material
  from the Inmate Central File.

All material not considered FOIA Exempt shall be filed in the
appropriate section of the Inmate Central File.

 a. Section One: Central Inmate Monitoring and Victim/Witness
Notification Packet

  (1) CIM (BP-339) (most current)
  (2) CIM (BP-340) (all)
  (3) CIM Documentation (all)
  (4) Cover Memorandum to Appropriate Review Authority (all)
  (5) CIM Approval Letter from Appropriate Review Authority
    (all)

    (6)   CIM Clearance Request with corresponding SENTRY
         Clearance Data Display.
    (7)   Victim/Witness Protection Packet - Notification Log
         (all)

      (a)   Initial Notification Letter
      (b)   All Other Victim/Witness Notification Documents (all)

 b.   <u>Section Two:  Miscellaneous Non-Disclosable Materials</u>

    (1)   Secret Service Card
    (2)   Non-Disclosable PSI, AO 235, 245, USA 792 and
         Sentencing Memo/Transcript
    (3)   FOIA Exempt In-Transit Data form (most current)
    (4)   Psychological/Psychiatric Intake Screening form (BP-435
         and 436) (Only FOIA EXEMPT) documents determined by
         Psychology staff.
    (5)   Visitor Information form (BP-309) (all)
    (6)   Visitor Authorization for Release form (BP-310) (all)
    (7)   Request for Conviction Information form (BP-311) (all)
    (8)   Any Materials from the Central File which are FOIA
         Exempt are to be filed chronologically.
    (9)   Any other Materials that are FOIA exempt:

      (a)   Study and Observation Cases (all)
      (b)   Confidential Investigations (all)

11.  <u>U.S. PAROLE COMMISSION MINI-FILES</u>.  All facilities shall
adhere to the U.S. Parole Commission Rules and Regulations in
creating and handling these files.

   a.  <u>Origin</u>.  The Unit Secretary shall create the Parole
Mini-file at the time of admission for all commitments who are
eligible for parole and will eventually be released with U.S.
Parole Commission supervision to follow.

   Files on inmates who do not receive a hearing or are not
granted parole but who have a mandatory or special parole term
after release shall be sent immediately after the inmate's
release to the appropriate U.S. Parole Commission Office which
has supervision responsibility.

   Parole Mini-files shall be created for adult sentences imposed
under 18 U.S.C. 4205(f) and the YCA provision 18 U.S.C. 3401(g)
of the Federal Magistrate Act of 1979.  Files shall also be
created for all inmates serving sentences imposed under 21 U.S.C.
848 (Continuing Criminal Enterprise) even though inmates
sentenced under such sentences are not eligible for parole.  Upon
the inmate's release from confinement, these files shall be sent
to the appropriate U.S. Parole Commission Office supervising the
inmate.

(Supplies of file folders and pressure-sensitive folder labels are obtained from the appropriate U.S. Parole Commission Office.)

b.  <u>Maintenance and Use</u>.  These files are to be maintained at the same institution at which the inmate is confined.  Prior to the initial parole hearing, the files are to be shipped via certified mail or via United Parcel Service, to the appropriate U.S. Parole Commission office.  Following review at the U.S. Parole Commission, the file is returned to the institution for storage until the hearings occur.

When practical, after hearings, U.S. Parole Commission examiners may take smaller quantities of these files with them when they return to their office.  Otherwise, other staff the Warden designates shall clip the Commission Order, hearing summary, tape and notes, and other hearing documents to the inside of the Parole Mini-file before transmittal in the order indicated.  These shall be delivered to the institution mailroom for shipment.  Hearing tapes shall be boxed and sent as soon as possible to the U.S. Parole Commission office.

When an inmate waives parole consideration or no hearing is conducted, the Parole Mini-file shall be forwarded upon the inmate's release to the U.S. Parole Commission office provided the inmate is released to the U.S. Parole Commission's supervision.

c.  <u>Contents</u>.  The contents of the Parole Mini-files are to be limited to the following:

    (1)  SENTRY Sentence Computation Record
    (2)  FBI Fingerprint Record (RAP Sheet)
    (3)  Judgment in a Criminal Case or Judgment and Commitment Order
    (4)  Pre-Sentence Report (if disclosable)
    (5)  Prosecuting Agency Report
    (6)  Classification Material
    (7)  Medical, Psychological and Psychiatric Reports (if separate from classification material and disclosable)
    (8)  U.S. Attorney/Judges Report (USA-792, AO-235)
    (9)  Progress Report (most current)
  (10)  Escape Reports
  (11)  Front Side of all Incident Reports with Discipline Hearing Officer Packet Given to Inmate
  (12)  Background Statement of Inmate (Parole form I-32)
  (13)  Application for Parole (Parole form I-24)
  (14)  Pre-Release Matters:

      (a)  Correspondence regarding release planning and aftercare arrangements.
      (b)  Correspondence regarding detainers.
      (c)  Release Certificates where applicable.

(d)  Recommendations relative to CCC or halfway house transfer including adjustment reports.
(e)  Committed fine documents.
(f)  Other pre-release matters.

(15)  Correspondence Relative to Parole Consideration
(16)  Policy established within the U.S. Parole Commission governing material emanating from the Commission and needed in the files. All material received from the Commission shall be filed.

Note: FOIA Exempt Material shall not be placed in Parole Mini-files.

e.  Organization. Material shall be organized within folders, by position, as follows with the latest date on top:

(1)  No. 1  Sentence Data

(a)  SENTRY Sentence Computation Record
(b)  Prosecuting Agency Report
(c)  Report of U.S. District Judge, AO-235 form
(d)  Report of U.S. Attorney, 792 form
(e)  FBI Fingerprint report (RAP Sheet)
(f)  Judgment and Commitment Order

(2)  No. 2  Classification Material

(a)  Progress Report (most current)
(b)  Escape Reports
(c)  Front Side of an Incident Report
(d)  Medical, psychological, and psychiatric reports, if disclosable
(e)  Classification Materials
(f)  Presentence Report of USPO (Probation form 2a), if disclosable

(3)  No. 3  General Correspondence

(4)  No. 4  Parole Material

Notice of Hearing - Parole Application (current and previous ones), Representative, and Disclosable Request (Parole form I-24)

e.  Maintenance, Security and Access, Responsibilities and Procedures. The same rules as for the Inmate Central File shall apply. Institution staff shall file any of the material described above that is received or generated prior to shipment of the files to the appropriate U.S. Parole Commission office. Routine filing material received or generated after that time

shall be forwarded to the appropriate U.S. Parole Commission office for filing.  Commission staff shall file official communications provided for Commission use through other channels.

f.  Transfers.  As inmates are transferred between institutions, each Parole Mini-file still held at the institution shall be included in the same package with the appropriate institution Inmate Central File as specified in the Security Designation and Custody Classification Manual.

g.  Inmate Review of Parole Commission Files.  Inmates may request review of the Parole Mini-file through the U.S. Parole Commission in accordance with 28 CFR 2.55 and 2.56.

12.  MAINTENANCE, SECURITY, AND ACCESS PROCEDURES

a.  Responsibility.  At the Warden's delegation, the Inmate Systems Manager (ISM) is the official custodian of inmate records.  The ISM is responsible for file retention and disposal, certification purposes, and court appearances when the record's presence is required outside normal operating situations.

The Regional Inmate Systems Administrator, at the Regional Director's delegation, shall have the same responsibilities at the Regional Office level.

At institutions where inmate files are stored centrally, the Warden's designee has supervisory responsibility.  Wherever Inmate Central Files are decentralized to functional units, supervisory responsibility shall belong to the Unit Manager and his/her staff.  Although some delegation is necessary, the Unit Manager is accountable for file security, control, and maintenance.  A clear method of accountability is to be established for the removal and return of files from this area (see subsection b. of this Section).

b.  General Requirements.  The following rules apply at every institution where inmates are confined and files maintained, regardless of whether the Inmate Central Files are centralized or decentralized.

(1)  Files may **never** be left unsecured or handled in such a way as to be accessible to unauthorized persons.  Staff shall ensure that inmates do not transport files and confidential materials.

(2)  Files shall be stored in secure cabinets in secure areas when not in use.  Fireproof cabinets shall be used or acquired except for those institutions which have specifically obtained a written exemption from the Assistant Director, Correctional Programs Division.

(3)  Because of the need for files in emergency situations, all files shall be returned to the file cabinet prior to the close of business or tour of duty of each user.  **Files shall not be locked away overnight in private desks, offices, cabinets or vaults, since accessibility to these locations in times of emergency poses problems.**  Inmate Central Files for inmates not housed in the institution (i.e. inmates on writ, home confinement, or housed in CCCs) are also counted on the same basis.  These files shall be kept in a separate section of the file cabinet to better facilitate file accountability.

(4)  An Inmate File Check-Out Card (BP-387) shall be prepared for each volume and remain with that volume.  The card is to be placed in the file cabinet with the volume, and each user shall sign and date the card when a volume is removed and leave the card in the volume's place. This system provides a tracking device when files are missing or needed for other purposes and improves the ability to take inventory.

(5)  All Inmate Central Files shall be counted any time that Central File cabinet is unlocked.  For example, if staff are on duty and open a file cabinet, all the files in that particular file cabinet must be counted that day.  Conversely, if staff are on duty but have no need to open the file cabinet, the files do not have to be counted.  Staff shall indicate "file not opened", initial, and date the file count record.  The following information shall be included in the file count record:

- the date/time of the count,
- total volumes counted,
- initials of the counter, and
- reasons for any changes since the previous day's count.

A name roster **and census** count must be conducted at least weekly.  This count consists of accounting for each file by securing a name roster printout from SENTRY and comparing the files in the cabinet with the name roster.  After completion, the printout shall be initialed, dated, and maintained for 90 days. The file count record shall be maintained for a period of 2 years.

c.  Security Level Requirements

(1)  Inmate Central Files in Minimum and Low Security Level institutions may be maintained securely within the functional unit in a secure manner at the Warden's discretion.

(2)  Inmate Central Files in Medium Security Level facilities may be maintained securely within the functional unit at the Regional Director's discretion and approval.

\*    (3)   Inmate Central Files in High Security Level facilities
may be maintained in either the functional unit with the Regional
Director's approval or, in a secure, centralized location.
Inmate Central Files maintained in a secure centralized location
do not require Regional Director approval.                          \*

      (4)   The location and security of Inmate Central Files in
Administrative facilities shall be reviewed and a determination
made on a case-by-case basis with the Regional Director's
approval.

13.  ROUTINE USES OF INMATE CENTRAL FILES.  The routine uses of
Bureau Inmate Central Files are periodically published in the
Federal Register.  At the time of this Program Statement's
publication, those include:

     a.  Routine Uses.  Routine uses of these files are to:

      (1)   Provide an information source to officers and employees
of the Department of Justice who have a need for the information
in the performance of their duties;

      (2)   Provide an information source to law enforcement
officials for investigations, criminal prosecutions, civil court
actions, or regulatory proceedings;

      (3)   Provide an information source for disclosure of
information on matters solely of general public record, such as
name, offense, sentence data, and release date;

      (4)   Disclose information to contracting or consulting or
correctional agencies that provide correctional services for
federal inmates;

      (5)   Provide an information source for responding to
inquiries from federal inmates involved in Congressional
inquiries;

      (6)   Provide information relating to federal offenders to
the courts, including court officials and probation officers;

      (7)   Provide victims and/or witnesses, pursuant to
victim/witness federal legislation and policy, information
relating to an inmate's furlough, parole (including appearance
before the U.S. Parole Commission), transfer to a community
corrections center, mandatory release, expiration of sentence,
escape (including apprehension), death, and other such release-
related information;

      (8)   Provide state agencies or authorities, pursuant to
Public Law 98-135, identifying data of Bureau inmates for the

purpose of matching the data against state records to review the eligibility of these inmates for unemployment compensation; the requesting state is to erase the Bureau data after this determination has been made;

(9)  Provide the Social Security Administration (SSA), pursuant to Public Law 96-473, identifying data of Bureau inmates for the purpose of matching the data against SSA records to enable the SSA to determine the eligibility of Bureau inmates to receive benefits under the Social Security Act; SSA is to erase the Bureau data after the match has been made;

(10)  Provide the Veterans Administration (VA), pursuant to Public Law 96-385, identifying data of Bureau inmates for the purpose of matching the data against VA records to determine the eligibility of Bureau inmates to receive veteran's benefits; the VA is to erase the Bureau data after the match has been made;

(11)  Provide information from an inmate record to an employee, former employee, or his or her designated representative when such information is included in the employee's or former employee's adverse or disciplinary personnel action file with respect to proposed adverse or disciplinary personnel action against that employee or former employee; the employee's or former employee's adverse or disciplinary personnel action file is covered by a government-wide system of records published by the Office of Personnel Management (OPM) entitled "Adverse Action Records, OPM/GOVT-3;" to protect the privacy of the inmate, information transferred to the employee's or former employee's adverse or disciplinary personnel action file will be sanitized as warranted and/or appropriate protective orders may be requested to prevent further dissemination; and

(12)  Provide an employee, former employee, or his or her designated representative information from an inmate record pursuant to regulations or order of any body properly trying the merits of an adverse or disciplinary personnel action, including an administrative agency, arbitrator, or court of competent jurisdiction; to protect the privacy of the inmate, information provided the employee, former employee, or his or her designated representative will be sanitized as warranted and/or appropriate protective orders may be requested to prevent further dissemination.

b.  Release of Information to the News Media.  Information which may be released to the news media and the public pursuant to 28 CFR 50.2 may be made available from systems of records maintained by the Department of Justice unless it is determined that release of the specific information in the context of a particular case would constitute an unwarranted invasion of personal privacy.

c.  Release of Information to Members of Congress.  Information
contained in systems of records maintained by the Department of
Justice, not otherwise required to be released pursuant to
5 U.S.C. 552 may be made available to a Member of Congress or
staff acting upon the Member's behalf when the Member or staff
requests the information on behalf of and at the request of the
individual who is the subject of the record.

d.  Release of Information to the National Archives and Records
Administration.  A record from a system of records may be
disclosed as a routine use to the National Archives and Records
Administration (NARA) in records management inspections conducted
under the authority of 44 U.S.C. 2904 and 2906.

14.  DISCLOSURE OF INMATE CENTRAL FILE MATERIAL.  The Privacy Act
of 1974 sets forth a series of requirements governing federal
agency record-keeping practices intended to safeguard individuals
against invasions of personal privacy.  The Act forbids release
of information from agency records without a written request by,
or without the prior written consent of, the individual to whom
the record pertains, except in specific instances as described in
the Act.  Civil sanctions and criminal penalties are prescribed
for violation of the provisions of the Privacy Act.

It is, therefore, imperative that each Bureau employee be
knowledgeable of this Act's provisions, and conform his or her
conduct to the Act regarding the maintenance of records and the
release of information contained in those records.  The Program
Statement on Release of Information establishes procedures for
the release of requested records in the possession of the Bureau.

15.  INMATE REVIEW OF INMATE CENTRAL FILE.  An inmate has the
option to look at materials maintained in his/her Inmate Central
File.  This procedure is not required by either the Freedom of
Information Act or Privacy Act.  A request submitted under FOIA,
for example, is processed formally under Department of Justice
and Bureau guidelines for handling such requests, in light of the
specific statutory provisions.  By contrast, the information
contained in this section establishes an administrative procedure
for inmate access to records which can properly be shown to the
inmate in accordance with sound correctional practices and
concerns.

a.  Local Procedures.  Each institution and facility shall
issue local instructions to implement this section.  Local
procedures shall include but are not limited to those items
listed in Section 15.a. and 15.b. of this Program Statement.
Each Chief Executive Officer (CEO) shall decide on the
expeditious and efficient means to accomplish any necessary file
review.  The CEO must designate those staff who are responsible
for the:

PS 5800.11
September 8, 1997
Page 19

(1)  initial review of all current files of the inmate
     population;
(2)  receipt of inmate requests to review files, and the
     monitoring of the inmate review of files; and
(3)  screening of all records and documents in the future as
     they are sent to the Inmate Central File for filing.

Each institution may adopt its own procedures and forms for
submitting and acknowledging requests and for logging and
scheduling Inmate Central File reviews.

   b.  <u>Inmate Request and Review</u>.  Any inmate seeking to look at
his/her Inmate Central File shall submit a request to a staff
member, as designated in the local instruction.

   • The inmate's request should be acknowledged.
   • The inmate should be permitted to review the file whenever
     practicable.
   • All file reviews must be done under constant and direct
     staff supervision.
   • Those materials which have been determined to be non-
     disclosable shall be removed from the folder before inmate
     review.
   • An entry shall be made on the Inmate Activity Record
     (BP-381) to show the date the inmate reviews the file.
     The staff member monitoring the review shall initial the
     entry and the inmate shall be asked to initial it.

   c.  <u>Inmate Challenge to Information</u>.  An inmate may challenge
the accuracy of the information in his or her Inmate Central
File.  Unit team staff shall take reasonable steps to
ensure the accuracy of challenged information, particularly when
that information is capable of being verified.  The inmate is
required to provide staff with sufficient information in support
of a challenge (names of persons to contact, government agency,
etc...).

   When an inmate provides such information, staff shall review
the alleged error(s) and take reasonable steps to ensure the
information is correct.

   For example, if an inmate challenges information in the
Presentence Investigation Report (PSI), staff should inform the
appropriate U.S. Probation Office (USPO) in writing of the
disputed information, and request that a written response also be
provided.  **USPO procedures, however, do not allow for changes or
addendums to be made to the Presentence Investigation Report
after sentencing since it is a court document.**

   If the USPO subsequently reports that the challenged
information, or some part thereof is not accurate, staff shall
attach the Bureau's inquiry and the USPO response to the

applicable section of the Inmate Central file, and also make a notation on the Inmate Activity Record form (BP-381) to ensure that future decisions affecting the inmate are not based on the discredited information.

When the USPO verifies that the information in the PSI is indeed inaccurate, as claimed by the inmate, staff should subsequently review, and where indicated, correct Bureau generated reports or data such as the Inmate Load and Security Designation form (BP-337), the Custody Classification form (BP-338), Progress Report, and any other reports that may have been based on the PSI. Bureau reports, data, or SENTRY transactions should be corrected within a reasonable period of time after identification as being inaccurate.

If the information source will provide a corrected document or data, it should be immediately inserted in the file or data base and the inaccurate information or document removed. A notation on the Inmate Activity Record form should acknowledge the insertion of the corrected information or document.

d. <u>Inmate Copies</u>. Any inmate who wishes to receive copies of disclosable materials from the file shall submit a request to institution staff. Within a reasonable time after the request, institution staff shall provide the inmate copies of requested disclosable documents maintained in the Inmate Central File. Fees for the copies are to be calculated in accordance with the Program Statement on Release of Information.

e. <u>Privacy Folder</u>. Records which have been determined, under separately issued guidelines, to be excluded from inmate review shall be placed in the Privacy Folder. Normally, actual placement of documents in the Inmate Central File is the Unit Secretary's responsibility. The Privacy Folder shall be placed on top of section 5 in the Inmate Central File.

As materials from any source are submitted for placement in the Inmate Central File, they are routed to an appropriate staff member the Warden designated. The Case Manager shall review the materials, to ascertain whether to place them in the regular sections, the Privacy Folder, or discard them. Any document to be excluded from inmate review must be stamped "FOI EXEMPT". At each Program Review and before an inmate reviews his/her Inmate Central File, the Case Manager shall review the file to ensure the proper location of forms and purge outdated or unnecessary forms and/or documentation.

f. <u>Parole Files</u>. Parole Mini-files, examiner packets, and pre-hearing assessments are not disclosable unless specifically authorized by the U.S. Parole Commission. The Parole Mini-file and other hearing materials must be removed from the Inmate Central File prior to inmate review. The inmate may seek review

of those materials through the U.S. Parole Commission in
accordance with 28 CFR 2.55 and 2.56.

16.  DOCUMENTATION OF DISCLOSURES.  The Privacy Act of 1974
requires accounting for both written and oral disclosures of
information about inmates.  Except for disclosures of information
of records made to other Department of Justice employees, and all
components thereof, and for disclosures required by the FOIA
(i.e., public information), an accounting of disclosures of any
information concerning an individual contained in a system of
records maintained by the Bureau shall be kept in accordance with
the following guidelines:

    a.  Oral Disclosures.  Staff are to take the position that only
public information is to be released orally.  Form BP-171 is
designed to assist the person receiving an oral request for
information in accounting for the results of the request.  The
form may also be used to document information which is released
and not covered by the FOIA.

A memorandum shall be prepared and retained in the file from
which the record is disclosed, or an appropriate notation will be
maintained in the file, attached to the recorded disclosed.

    b.  Written Disclosure.  Accounting for written disclosures is
made in the same manner as for oral disclosures, or may be made
by retaining a copy of the correspondence requesting the
information and a copy of the response in the file from which the
record is disclosed.

17.  TRANSFER OF RECORDS BETWEEN BUREAU FACILITIES

    a.  Transfer Out.  Procedures for processing all records,
including the Inmate Central File, are covered in the Inmate
Systems Management Manual.

    b.  Transfer In.  Inmate Systems Department staff shall receive
and process records on transferring inmates as follows:

    (1)  Judgment in a Criminal Case and Judgment and Commitment
Files shall be pulled for audit by the Inmate Systems staff;

    (2)  Medical records shall be sent to the Health
Services Administrator;

    (3)  Mental Health records shall be sent to the Chief
Psychologist/Psychiatrist;

    (4)  Inmate Central Files related materials and Parole
Mini-files, if any, shall be sent to the appropriate Unit
Manager.

c.  Parole Violators, Mandatory Release Violators, Escapees
Files.  If the inmate is committed elsewhere, his/her files shall
be shipped immediately upon designation.  Files shall be prepared
for shipment the same as for transfer and mailed by **Certified
Mail, Return Receipt Requested**.  Files on these cases, if not
already received, shall be requested by telephone, BOPNet
GroupWise, or EMS, and shall be processed upon receipt the same
as for transferring inmates.

18.  REQUESTS FOR FORWARDING INMATE FILES.  All requests for
inmate files from individuals or agencies outside the Bureau
shall be referred to the ISM Department for review and action as
required in the Inmate Systems Management Manual.  Requests from
Bureau facilities shall also be referred to the ISM Department
for review.

Ordinarily, if an inmate's projected stay at another institution
(i.e., writs) is for 60 days or more, the parent institution
shall be contacted to forward the Inmate Central File to the
holdover institution.  This contact is to be documented and
should not require weekly follow-up.

19.  RETIREMENT OF INMATE CENTRAL FILES

a.  Files on Expired Sentences.  Files on these sentences shall
not be combined with new sentence files.  However, they may be
retrieved for review and then returned to the Federal Records
Center after the review is completed.

b.  Files Processing at Final Release.  The following
procedures shall be completed at the time of each inmate's
release.

(1)  Inmate Central File folders shall be retained in the
unit for approximately two weeks after the inmate's release.
Files for inmates housed in halfway house facilities or community
release status (i.e. home confinement, community corrections
centers (CCC)) shall be maintained with the unit files until the
final release paperwork is received from the CCC.  This allows
for final release papers to be consolidated and filed before the
file is forwarded to the ISM Department for inactive file
storage.  Unit Managers are responsible for ensuring all required
documents are in the Inmate Central File prior to retirement of
the file.

(2)  Inmate Central Files are preserved for 30 years after
the sentence expiration.  Therefore, following release from
service of the confinement portion of the sentence, medical,
mental health, and visiting records shall be forwarded to the
appropriate unit for consolidation with the Inmate Central File.
The consolidated file is then sent to the ISM Department.  The
Judgment in a Criminal Case/Judgment and Commitment file is

included in the consolidated file at retirement.

The outside of the file folder shall be stamped with the year of expiration of sentence and files shall be stored according to local procedures. Expiration of sentence for this purpose is defined as the date supervision expires plus any special parole term, probation, supervised release, or the date released from confinement with no supervision to follow plus any special parole term.

(3)  Files designated for research purposes shall be forwarded to the Office of Research and Evaluation (ORE), Central Office and scheduled for disposal as ORE determines.  A notation shall be entered on the permanent alpha index card in each case to indicate to whom in ORE the file was sent.

(4)  Material received regarding inmates who have been released from serving their sentences shall be destroyed with the exception of death notices or certificates and copies of U.S. Parole Commission correspondence to the U.S. Marshals Service transmitting warrants and court orders or documents. Questionable material may be referred to the Case Management Coordinator, Inmate Systems Manager, or the Regional Correctional Programs Administrator for a decision.

c.  <u>Retention and Disposal of Inmate Central Files</u>.  Specific procedures for the retention and disposal of Inmate Central Files are contained in the Inmate Systems Management Manual.

20.  <u>INSTITUTION SUPPLEMENT</u>.  Each institution is to develop an Institution Supplement to include the following information:

a.  Designate the location of pretrial and INS file folders.

b.  Identify the pretrial and INS file folder accountability procedures.

<u>Note</u>:  These instructions should clearly set forth procedures to ensure the maintenance, security, and access responsibilities.

c.  Procedures to implement the inmate review of the Inmate Central File.

/s/
Kathleen M. Hawk
Director

**E X H I B I T   B-1**

REJECTION NOTICE - ADMINISTRATIVE REMEDY

DATE: JULY 30, 2007

FROM: ADMINISTRATIVE REMEDY COORDINATOR
      PRIVATIZATION MGT. BRANCH

TO  : AINSWORTH CHARLES JACKSON, 19728-101
      RIVERS CI,   UNT: B    QTR: B01-216L
      P.O. BOX 840
      WINTON,  NC 27986

FOR THE REASONS LISTED BELOW, THIS REGIONAL APPEAL
IS BEING REJECTED AND RETURNED TO YOU. YOU SHOULD INCLUDE A COPY
OF THIS NOTICE WITH ANY FUTURE CORRESPONDENCE REGARDING THE REJECTION.

REMEDY ID       : 461112-R1       REGIONAL APPEAL
DATE RECEIVED   : JULY 30, 2007
SUBJECT 1       : RESEARCH/GENETIC TESTING PROGRAMS
SUBJECT 2       :
INCIDENT RPT NO:

REJECT REASON 1: SEE REMARKS.

REMARKS         : THIS ISSUE IS NOT APPEALABLE TO THE BOP.  YOU MUST
                  USE THE GRIEVANCE PROCEDURES AT YOUR FACILITY.

U.S. Department of Justice

Federal Bureau of Prisons

**Regional Administrative Remedy Appeal**

Type or use ball-point pen. If attachments are needed, submit four copies. One copy of the completed BP-229(13) including any attachments must be submitted with this appeal.

From: JACKSON, Ainsworth C        19728-101        B1        RCI
        LAST NAME, FIRST, MIDDLE INITIAL        REG. NO.        UNIT        INSTITUTION

**Part A - REASON FOR APPEAL**

This is a complaint which involves a Sellers v. Bureau of Prisons, 959 F.2d 307, where Rivers Correctional Institution is using erroneous information contained in their files concerning the fact that they state that the crime I pleaded guilty to in 1988 in the U.S. District Court for the District of Greenville, South Carolina (Resisting Arrest, 18 U.S.C. § 1510) is a "Crime of Violence for the purpose that I need to take a DNA test, as well as "Notification" pursuant to 18 U.S.C. § 4042(b) should be done in my case. The staff at Rivers is direct conflict with what the Bureau of Prisons had originally classified me under, based on the fact that the Bureau of Prisons staff had all of my Presentecne Reports to make the classification that my crime of 1988 was not a "Crime of Violence" and therefore, I was not subject to DNA samples given, nor "Notification" pursuant to 18 U.S.C. § 4042(b). Bureau of Prisons Policy Statement # 5162 also states what is a crime of violence, and none of the charges for which I have been convicted of qualify as "Crimes of Violence."

7-20-2007                                    Ainsworth C. Jackson
        DATE                                    SIGNATURE OF REQUESTER

**Part B - RESPONSE**

RECEIVED

JUL 3 0 2011

Privatization Mgt. Branch

_____        _____
        DATE                        REGIONAL DIRECTOR

If dissatisfied with this response, you may appeal to the General Counsel. Your appeal must be received in the General Counsel's Office within 30 calendar days of the date of this response.

ORIGINAL: RETURN TO INMATE                CASE NUMBER: 46HI-12-R/

**Part C - RECEIPT**

                                        CASE NUMBER: _____

Return to: _____
        LAST NAME, FIRST, MIDDLE INITIAL        REG. NO.        UNIT        INSTITUTION

SUBJECT: _____

_____                _____
        DATE                        SIGNATURE, RECIPIENT OF REGIONAL APPEAL

UPN LVN                PRINTED ON RECYCLED PAPER                BP-230(13)
                                                JUNE 2002

E X H I B I T   B-2

REJECTION NOTICE - ADMINISTRATIVE REMEDY

DATE: ~~SEPTEMBER 26,~~ *October 4* 2007

FROM: ADMINISTRATIVE REMEDY COORDINATOR
PRIVATIZATION MGT. BRANCH

TO : AINSWORTH CHARLES JACKSON, 19728-101
RIVERS CI    UNT: B    QTR: B01-216L
P.O. BOX 840
WINTON, NC 27986

FOR THE REASONS LISTED BELOW, THIS REGIONAL APPEAL
IS BEING REJECTED AND RETURNED TO YOU. YOU SHOULD INCLUDE A COPY
OF THIS NOTICE WITH ANY FUTURE CORRESPONDENCE REGARDING THE REJECTION.

REMEDY ID      : 467760-R1       REGIONAL APPEAL
DATE RECEIVED  : SEPTEMBER 24, 2007
SUBJECT 1      : CLASSIFICATION/PROGRAM REVIEWS
SUBJECT 2      :
INCIDENT RPT NO:

REJECT REASON 1: YOU MUST FIRST FILE A BP-9 REQUEST THROUGH THE INSTITUTION
                 FOR THE WARDEN'S REVIEW AND RESPONSE BEFORE FILING AN APPEAL
                 AT THIS LEVEL.

REJECT REASON 2: YOU MAY RESUBMIT YOUR APPEAL IN PROPER FORM WITHIN
                 15 DAYS OF THE DATE OF THIS REJECTION NOTICE.

---

I certify that the following person _____ # 19228-101
                                        Signature                    Register Number

personally appeared before me this day and received the attached document.

10/10/07
Date

J. Alexander, Case Manager, Unit B
Witness Signature, Title : Housing Unit

(Please forward this sheet to the Warden's Office upon completion. As always, thank you for your assistance).

E X H I B I T  D

June 4, 2007


Ainsworth C. Jackson
Reg. No. 19728-101
CI Rivers
P.O. Box 630
Winton, NC 27986


George E. Snyder, Warden
Rivers Correctional Institution
145 Parker's Fishery Road
P.O. Box 840
Winton, NC 27986


Dear Warden Snyder:


In reply to your letter dated May 31, 2007 where you have
alleged that I am required to give a DNA Sample due to my conviction
of "Interstate Transportation of Securities Taken By Fraud," which
you allege is a qualifying offense of 3559 VCCLEA (Non-violent
Sentence), as well as pursuant to 18 U.S.C. § 4042(b) and BOP Policy
Statement #5110.15, notification is to be given to law enforcement
upon my release.

Addresssing first the DNA Sample, you are totally incorrect
about me having to give up a DNA Sample based on the non-violent
crime of "Interstate Transportation of Securities Taken By Fraud."
Under the "Violent Crime Control and Law Enforcement Act of 1994,
the charge of "Interstate Transportation of Securities Taken by
Fraud" was not a qualifying federal offense, had it been a qualifying
offense the Honorable Judge Stanley S. Harris, U.S. District Court
for the District of Columbia would have order pursuant to 18 U.S.C.
§ 3583(d) as a condition of my "Supervised Release" that a DNA
Sample be taken.  Furthermore, I served this sentence in a Bureau
of Prisons facility and at no time was it required for me to give
up a DNA Sample before I was released from prison.  Also, pursuant
to Bureau of Prisons Policy Statement #5162.02, it lists the VCCLEA
crimes that qualify for DNA SAmples, and the crime of "Interstate
Transportation of Securities Taken By Fraud" is not one of them,
therefore, I am not required to give up a DNA Sample before I am
released from prison.

In regards to the "Assault on a Federal Officer in 1987, not
1988, I was charged pursuant to 18 U.S.C. § 1501, which is a mis-
demeanor, not a felony, and I was given five (5) months and eighteen
(18) days, and the Unit Management Staff could not have possibly
used their best judgment in this matter because they completely
ignored what the Bureau of Prisons had already classified me under,
because this matter had already been addressed while I was in the
custody of the Bureau of Prisons who had my complete file in their
possession in order to determine whether this crime was a misdemeanor

or felony, because they had my 1988 PSI, something this staff does not have. Also, there is no written authorization or agreement in the contract between the GEO Group, Inc. and the Bureau of Prisons where it authorizes Rivers Correctional Institution to take DNA Samples from prisoners.

Finally, the crime of "Interstate Transportation of Securities Taken By Fraud" is a violation of 18 U.S.C. § 2314, and is not a qualifying offense (Non-Violent) under the VCCLEA of 1994, and therefore, I am not subject to giving a DNA Sample upon my release from prison.


Sincerely,

Ainsworth C. Jackson

cc:  Dr. George C. Zoley, Chairman
     The GEO Group, Inc.

     Harley G. Lappin, Director
     Federal Bureau of Prisons

-2-

**E X H I B I T   E**



**U.S. Department of Justice**
Federal Bureau of Prisons

# Program
# Statement

| | |
|---|---|
| **OPI:** | CPD |
| **NUMBER:** | 5110.15 |
| **DATE:** | 8/30/2000 |
| **SUBJECT:** | Notification of Release to State and Local Law Enforcement Officials |

1. **PURPOSE AND SCOPE.** To prescribe procedures required by 18 U.S.C. § 4042(b), regarding the Notification of Release of Prisoners.

18 U.S.C. § 4042(b), requires in part that the Bureau notify state and local law enforcement officials at least five calendar days prior to releasing to Supervised Release, probation, or parole, prisoners who have been convicted of a "drug trafficking crime" or a "crime of violence." Inmates released under the protection of Chapter 224 Witness Protection Program are exempt from this provision.

2. **SUMMARY OF CHANGES.** The re-issuance of this Program Statement includes the following modifications:

- The requirement that Community Corrections Managers (CCMs) provide notification five days prior to transfer to Home Confinement has been modified in order to allow for more expedient placement.

- This re-issuance references Section 6 of the Categorization of Offenses Program Statement to identify current violent offenses. It also directs staff not to notify for offenses categorized under Section 7, Director's Discretion.

- Applicable SENTRY CMA notification assignments previously introduced in an Operations Memorandum are incorporated into this Program Statement.

- The requirement for unit staff to forward two paper copies of the Notification of Prisoner Release Form (BP-s554) to the CCM has been changed to require unit staff to forward an electronic version.

● Lastly, the Notification of Prisoner Release form (BP-s554) has been modified for improved transmission of information.

3. **PROGRAM OBJECTIVE.** The expected result of this program is:

State and local law enforcement officials will be notified at least five calendar days prior to the release of inmates convicted of a "drug trafficking crime" or a "crime of violence."

4. **DIRECTIVES AFFECTED**

   a. **Directive Rescinded**

   | PS 5110.12 | Notifications of Release to State and Local Law Enforcement Officials (1/21/98) |
   |---|---|

   b. **Directives Referenced**

   | PS 1330.13 | Administrative Remedy Program (12/22/95) |
   |---|---|
   | PS 5100.06 | Security Designation and Custody Classification Manual (6/7/96) |
   | PS 5141.02 | Sex Offender Notification and Registration (12/14/98) |
   | PS 5162.04 | Categorization of Offenses (10/9/97) |
   | PS 5322.11 | Classification and Program Review of Inmates (3/11/99) |
   | PS 5880.28 | Sentence Computation Manual (CCCA of 1984) (2/21/92) |
   | PS 7300.09 | Community Corrections Manual (1/12/98) |
   | PS 7320.01 | Home Confinement (9/6/95) |

5. **STANDARDS REFERENCED**

   a. American Correctional Association 3rd Edition Standards for Adult Correctional Institutions: 3-4393

   b. American Correctional Association 3rd Edition Standards for Adult Local Detention Facilities: 3-ALDF-4G-07

   c. American Correctional Association 2nd Edition Standards for Administration of Correctional Agencies: None

   d. American Correctional Association Standards for Adult Correctional Boot Camp Programs: 1-ABC-4G-15

6. **PRETRIAL/HOLDOVER AND/OR DETAINEE PROCEDURES.** Procedures required in this Program Statement do not apply to pretrial inmates or detainees. Procedures do, however, apply to any sentenced Bureau inmate who may be a holdover in a Bureau or contract facility.

7. **WITSEC PROCEDURES.** Unless the Inmate Monitoring Section (IMS) specifically advises otherwise, institution and Community Corrections staff must complete notification procedures for all WITSECs who meet the notification guidelines set forth in Sections 8, 9, and 11 of this Program Statement. BP-s554s should be sent out as expeditiously as possible following receipt of the Release Authorization from the IMS.

8. **DEFINITIONS**

   a. **Drug Trafficking Crime.** Any current or prior felony offense under 21 U.S.C. § 801 through § 863 (inclusive), 21 U.S.C. § 951 through § 971 (inclusive), or 46 U.S.C. App. § 1903 (see 18 U.S.C. § 924(c)(2)).

   b. **Crime of Violence.** An offense that is a felony and:

      (1)  has as an element, the use, attempted use, or threatened use of physical force against the person or property of another; or,

      (2)  that by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense (see 18 U.S.C. § 924(c)(3)).

   c. **Supervised Release.** A term of supervision to be served upon release from prison pursuant to 18 U.S.C. § 3583.

   d. **Parole.** A discretionary grant of release pursuant to 18 U.S.C. § 4206 (a) or (d) or a mandatory release pursuant to 18 U.S.C. § 4164 (repealed). For the purpose of this Program Statement, the term "parole" also includes a term of Special Parole (21 U.S.C. § 841(c)).

   e. **Chief Law Enforcement Officer of the State.** The state Attorney General as identified by the recommended source document named in Section 14.d. Exceptions to this definition shall be immediately reported to the Administrator, Correctional Programs Branch, Central Office.

f. **Chief Law Enforcement Officer of the Local Jurisdiction**. The appropriate municipal or county law enforcement agency with jurisdictional authority consistent with the inmate's Supervised Release, probation, or parole address.  When multiple jurisdictions have overlapping authority, the more geographically specific agency as identified by the source document named in Section 14.d. should be used.

9.  **APPLICABILITY**.  The procedures in this Program Statement apply to any prisoner in Bureau custody who is:

a.  To be released to Supervised Release, probation, or parole; and

b. (1)  whose **current** offense of conviction is a "drug trafficking crime" or a "crime of violence" as defined in Sections 8.a. or 8.b., or

(2)  whose criminal **history** as determined by staff, in the exercise of professional judgment, includes a conviction for "drug trafficking" or a "crime of violence" as defined in Sections 8.a. or 8.b.  For "drug trafficking crimes," staff are to consider only federal convictions as a basis for notification. For "crimes of violence," staff are to consider both state and federal convictions as a basis for notification.

Information regarding the current offense of conviction is obtained from the Judgment in a Criminal Case and the Presentence Investigation Report (PSI).  Information regarding an individual's criminal history is obtained from the PSI.

Staff must refer to Section 6 of the Categorization of Offenses Program Statement to determine whether a federal offense may be considered a "crime of violence."  Notification must not be issued for an offense listed in Section 7 of the Categorization of Offenses Program Statement; however, if the inmate also has a drug or sex offense, or **prior** violent offense, relative notification should be processed accordingly.

Prior convictions warranting notification must be for felonies; convictions identified as misdemeanors should be disregarded for purposes of this Program Statement.  In the event that the prior convictions are not identified as felony or misdemeanor offenses, unit management staff should use their best judgment in regard to notification.

PS 5110.15
8/30/2000
Page 5

10. **EXCEPTIONS**

a. **Juveniles.**  Notification pursuant to this Program Statement is not required for offenders adjudicated juvenile delinquent pursuant to 18 U.S.C. § 5037; however, if an inmate was tried as an adult for a "drug trafficking crime" or a "crime of violence," notification to state and local law enforcement officials is required.

b. **Treaty Transfer Cases.**  A U.S. citizen convicted of a crime in another country and received in Bureau custody under the International Treaty Transfer Program is not subject to notification pursuant to a crime described in Section 8.a. of this Program Statement.  However, prior U.S. federal felony drug convictions, as defined in Section 8.a. of this Program Statement, require notification.  Additionally, such inmates will be subject to notification for a crime which meets the definition of crime of violence contained in Section 8.b. of this Program Statement.

c. **Detainers.**  Inmates releasing to a **detaining authority** do not require completion of a BP-s554; however, should institution staff receive written notice that the detainer was not executed, and the inmate was released on Supervised Release, probation, or parole, a reasonable attempt must be made to notify state and local law enforcement officials of the inmate's release to Supervised Release, probation, or parole based upon the inmate's most recent release information.

11. **CRIMES COMMITTED WHILE IN CUSTODY.**  Violent crimes and drug trafficking crimes committed while in the custody of the Bureau or other correctional agencies are not to be used unless there was a court conviction.

12. **SENTRY PROCEDURES.**  Appropriate SENTRY CMA assignments must be entered at initial classification in accordance with the Program Statement on Classification and Program Review of Inmates.  The following assignments apply to the provisions of this Program Statement.  Each inmate must have at least one assignment pertaining to notification.

| ASSIGNMENT | DESCRIPTION | GROUP CODE |
|---|---|---|
| **V94 CVB913** | **V94 CURR VIOL BEFORE 91394** | **VVB** |
| | Currently convicted for a crime of violence with date of offense before September 13, 1994. Staff must refer to **Section 6** of the | |

Categorization of Offenses Program Statement to determine whether a federal offense may be considered a "crime of violence."

**V94 CVA913**     **V94 CURR VIOL ON/AFTER 91394**        **VVA**

Currently convicted for a crime of violence with date of offense on or after September 13, 1994.  Staff must refer to **Section 6** of the Categorization of Offenses Program Statement to determine whether a federal offense may be considered a "crime of violence."

**Note:**  Inmates categorized as having a "Director's Discretion" type offense (Section 7, Categorization of Offenses), **do not require, and should not be processed for** notification of a violent offense.  (However, if the inmate also has a drug or sex offense, or **prior** violent offense, relevant notification should be processed accordingly.)

**V94 PV**        **PAST VIOLENCE**                **VVP**

Previously convicted for a crime of violence regardless of the date of offense.

**V94 CDB913**     **V94 CURR DRG TRAF BEFORE 91394**      **VDB**

Currently convicted for a drug trafficking crime with date of offense before September 13, 1994.

**V94 CDA913**     **V94 CURR DRG TRAF ON/AFT 91394**      **VDA**

Currently convicted for a drug trafficking charge with date of offense on or after September 13, 1994.

**V94 PD**        **V94 PAST DRUG TRAFFICKING**         **VDP**

Previously convicted for a **federal** drug trafficking crime, regardless of offense date.

**V94 COB913**     **V94 CURR OTHER BEFORE 91394**        **VOB**

Currently convicted for an offense that is not drug trafficking nor a crime of violence.  The date of offense is before September 13, 1994.

**V94 COA913**        **V94 CURR OTHER ON/AFTER 91394**        **VOA**

> Currently convicted for an offense that is not
> drug trafficking nor a crime of violence.  The
> date of offense is on or after
> September 13, 1994.

Upon a thorough review of the inmate's Presentence Investigation
Report (PSI) unit management staff will assign an appropriate CMA
assignment as indicated above.  Unit management staff must also
complete the BP-613 only on VCCLEA inmates and forward it to the
ISM within five days of initial classification (Inmates sentenced
under VCCLEA provisions are those inmates whose offense occurred
on or after 9/13/94 but prior to 4/26/96 (see appendix A,
Security Designation and Custody Classification Manual)).  Any
questions regarding VCCLEA sentencing determination should be
directed to the ISM, who is the final authority to determine if
the inmate is VCCLEA.

13.  **INMATE NOTIFICATION PROCEDURES.**  All newly designated
inmates identified by the applicability criteria in Section 9
must be notified in writing at initial classification of the
provisions of 18 U.S.C. § 4042(b).  This notification is to be
included on the Program Review Report, with a permanent copy
filed in section 5 of the Inmate Central File.  Subsequent review
of the inmate's status is required at each program review.  If
there are changes in this status, the inmate will be notified and
a copy of this change filed in section 5 of the inmate's central
file in addition to the initial notification.  Written
notification is also required on the inmate's final release
progress report (paragraph 17(c), Release Planning-USPO).

14.  **LAW ENFORCEMENT NOTIFICATION PROCEDURES.**  Staff are to
access SENTRY to monitor the names and projected release dates of
all imminent releases.  The inmate's release address shall be
used to determine the appropriate agencies to receive
notification.

    a.  **Direct Institution Release to Supervised Release,
Probation, Parole, or Direct Transfer to Home Confinement.**  Unit
management staff are to prepare the BP-s554.  Normally, the form
is mailed via regular, first class mail **at least two weeks prior**
to the inmate's release to Supervised Release, probation, or
parole, or direct transfer to Home Confinement.  This is to
ensure receipt at least five calendar days prior to the inmate's
placement in the community.  Process the form as follows:

- Send one BP-s554 to the chief **state** law enforcement official; attach an FBI Identification Record ("rap sheet") or National Crime Information Center (NCIC) printout, if an FBI "rap sheet" is not available;

- Send one BP-s554 to the chief **local** law enforcement official; attach an FBI Identification Record ("rap sheet") or NCIC printout, if an FBI "rap sheet" is not available; and

- Send one BP-s554 to the appropriate U.S. Probation Office.

Facsimiles may be used, as an alternate method, to transmit the BP-s554 when confirmation of transmission can be ensured and documented.

A dated copy of each notification form shall be maintained in the disclosable portion of section 5 (Release Processing) of the Inmate Central File.

(1) **Immediate Release.**  When the court orders the immediate release of an inmate who is subject to notification, staff shall notify the appropriate state and local law enforcement agencies **without delay.**  The notification shall be forwarded immediately (normally the first business day) via facsimile (fax) to state and local law enforcement officials.  An original notification must be mailed via regular mail to state and local law enforcement officials.

b.  **Inmates Transferred from an Institution to a CCC.**  When inmates are being transferred to a CCC prior to releasing to a term of Supervised Release, probation, or parole, institution unit management staff must forward the following materials to the appropriate CCM, along with the other required release paperwork:

- An electronic version of the BP-s554, with all sections complete except the law enforcement addressee, the inmate's projected address, and the signature block; and

- Two copies of the FBI Identification Record ("rap sheet") or NCIC printout, if an FBI "rap sheet" is not available.

CCMs shall ensure the information is complete and accurate, and complete the law enforcement addressee block, the inmate's projected address block, and sign and date the original notification forms before mailing.

c. **CCC Release to Supervised Release, Probation, Parole, or Transfer to Home Confinement.** The following procedures are required for processing inmates who are currently in a CCC and are releasing directly to supervision or are transferring to Home Confinement. Normally, the form is mailed via regular first class mail from the institution **at least two weeks prior to the inmate's release** to Supervised Release, probation, or parole, to ensure it is received at least five calendar days prior to the inmate's release date.

For inmates transferring from a CCC to Home Confinement, the CCM is to mail the BP-s554 within two business days of the decision to place the inmate on Home Confinement. **Further notification is not required when the inmate is released from Home Confinement to release supervision.**

CCMs must routinely monitor any changes in an inmate's final release plan which may affect the BP-s554, particularly the final release date and release conditions/restrictions. Process the form as follows:

- Send one BP-s554 to the chief **state** law enforcement official; attach an FBI Identification Record ("rap sheet") or NCIC printout, if an FBI "rap sheet" is not available;

- Send one BP-s554 to the chief **local** law enforcement official; attach an FBI Identification Record ("rap sheet") or NCIC printout, if an FBI "rap sheet" is not available; and,

- Send one BP-s554 to the appropriate U.S. Probation Office.

Facsimiles may be used, as an alternate method, to transmit the BP-s554 when confirmation of transmission can be ensured and documented.

A dated copy of each notification form is to be maintained in the disclosable portion of section 5 (Release Processing) of the Inmate Central File.

d. **Law Enforcement Agency Directory.** A source for identifying the name and address of state and local law enforcement officials is the:

> National Directory of Law Enforcement Administrators, Correctional Institutions and Related Agencies

SPAN Publishing, Inc.
PO Box 365
Stevens Point WI 54481-0365
(1-800-647-7579).

A comprehensive list of all Chief Law Enforcement Officers of
each state is available on BOPDOCS. Additionally, any local
jurisdictions which have requested an individual or office other
than what is provided in the National Directory of Law
Enforcement Administrators is also available on BOPDOCS.

15. **FORM PREPARATION.** Bureau staff may reproduce the BP-s554
locally. Each required BP-s554 must contain the following
information:

a. Offender's Name;

b. Criminal History. For each conviction for a crime of
violence or drug trafficking crime, staff shall include a
succinct description of the crime to the extent that descriptive
information is available. When neither an FBI "rap sheet" nor an
NCIC printout is available, staff should write a summary of the
inmate's criminal history from the PSI. Copies of the PSI should
not be provided to these agencies.

c. Final Release date to Supervised Release, probation, or
parole;

d. Offender's Projected Address on Supervised Release,
probation, or parole; and

e. Release Conditions or Restrictions (any restrictions on
conduct or other conditions to the release of the prisoner
imposed by the sentencing court other than the Standard
Conditions of Supervision found on the J&C).

If more space is required for any element, staff must type the
remaining information on additional sheets, and include a note
in the appropriate element that the information continues on the
additional sheets.

                                    /s/
                              Kathleen Hawk Sawyer
                              Director

E X H I B I T   F



**U.S. Department of Justice**
Federal Bureau of Prisons

# Program Statement

**OPI:** OGC
**NUMBER:** 5162.02
**DATE:** July 24, 1995
**SUBJECT:** Definition of Term,
"Crimes of Violence"

1. <u>PURPOSE AND SCOPE</u>. To implement various portions of the Violent Crime Control and Law Enforcement Act of 1994 (VCCLEA) that make reference to "nonviolent offense," and "crime of violence," specifically, Section 20417, <u>Notification of Release of Prisoners</u>, Section 20405, <u>Crediting of "Good Time</u>," and Section 32001, <u>Substance Abuse Treatment in Federal Prisons</u>. This Program Statement defines "crime of violence" as that term is used in these sections of the VCCLEA. The definition includes broad statutory language, as well as a framework for determining which specific criminal offenses fall within the statutory definition.

2. <u>PROGRAM OBJECTIVES</u>. The expected results of this program are:

   a. An inmate whose offense is a crime of violence will have that status reflected in his or her record and be subject to the limitations imposed by that status.

   b. Case management staff will review relevant documents to determine whether an inmate has committed a crime of violence.

3. <u>DIRECTIVES REFERENCED</u>

| | | |
|---|---|---|
| P.S. 5322.09 | Classification and Program Review of Inmates (03/10/94) |
| P.S. 5330.10 | Drug Abuse Programs Manual, Inmate (05/25/95) |
| P.S. 5800.07 | Inmate Systems Management Manual (12/24/91) |
| P.S. 5800.08 | Receiving and Discharge Manual (06/15/93) |
| P.S. 5880.28 | Sentence Computation Manual (CCCA of 1984) (02/21/92) |
| P.S. 5880.30 | Sentence Computation Manual (Old Law, Pre-CCCA of 1984) (07/16/93) |

4. <u>STANDARDS REFERENCED</u>. None.

P.S. 5162.02
July 24, 1995
Page 2

5.  <u>STATUTORY DEFINITION</u>.  Title 18 of the United States Code
defines "crime of violence" in Section 924(c)(3) as follows:

>  "  The term 'crime of violence' means an offense that
>  is a felony and--
>
>  (A)  has as an element the use, attempted use, or threatened
>       use of physical force against the person or property of
>       another, or
>
>  (B)  that by its nature, involves a substantial risk that
>       physical force against the person or property of
>       another may be used in the course of committing the
>       offense."

6.  <u>CRIMINAL PROVISIONS OF THE UNITED STATES CODE</u>.  Criminal
offenses are defined in many different titles of the United
States Code including Titles 7, 16, 18, 21, 26, 29, 30, and 46.
The offenses contained within these titles that may be crimes of
violence are listed in the various sections below.  If a
particular code section in these titles is not listed below, and
case management staff believe that the crime might be violent,
they should contact Regional Counsel.  Additionally, if a
Judgment and Commitment Order references a United States Code
section that is not found in Titles 7, 16, 18, 21, 26, 30, 42, or
49, please contact Regional Counsel to determine whether the
particular offense should be categorized as a "crime of
violence."

Some of the Code sections may be listed in more than one section
below; this duplication is indicated by an asterisk.  In such
cases, staff should check subsequent sections of the Program
Statement to determine whether the offense is a "crime of
violence."

7.  <u>CRIMINAL OFFENSES THAT ARE CRIMES OF VIOLENCE IN ALL CASES</u>.
Any conviction for an offense listed below should be categorized
as a "crime of violence."

  a.  <u>Title 18, United State Code Sections</u>

  - **32**      (destruction of aircraft)
  - **34**      (penalty when death results)
  - **35(b)**   (conveying false information that harms human
               life)
  - **36**      VCCLEA addition (firing weapons into group of
               persons)
  - **37**      VCCLEA addition (violence at international
               airports)
  - **43(b)**   (animal enterprise terrorism causing death or
               injury)
  - **81**      (arson w/in maritime jurisdiction)
  - **111**     (assaulting officers of the United States)
  - **112(a)**  (assaulting foreign officials)

P.S. 5162.02
CN-01, April 23, 1996
Page 3

- **113** (assaults w/in maritime jurisdictions)
- **114** (maiming w/in maritime jurisdiction)
- **115** (threatening family member of a federal official)
- **175** (biological weapons)
- **231** (civil disorders)
- **245** (federally protected activities)
- **247(a)(1)** (damage to religious property/obstruction of exercise of religion)
- **247(a)(2)** (obstruction of persons in free exercise of religion)
- **351** (assassination of cabinet and congress members)
- **373** (soliciting to commit a violent act)
- **753** (rescue of an inmate to prevent execution)
- **842** (explosive materials)
- **844** (penalties)
- **871** (threats against the President)
- **875(a),(b),(c)** (interstate communications)
- **878** (threats against foreign officials)
- **879** (threats against former presidents)
- **922(a)(4), (a)(7), (a)(8), (b)(4), (b)(5), (d)(1), (d)(2), (d)(4), (d)(8), (g),(o),(p)** (firearms violations)
- **924(c)** (firearms used in violent or drug trafficking crimes)
- **930(b) & (c)** (possession of firearms in federal facilities)
- **970(a)** (damage of property owned by foreign governments)
- **1091** (genocide)
- **1111** (murder)
- **1112** (manslaughter)
- **1113** (attempt to commit murder or manslaughter)
- **1114** (murder of officers)
- **1116** (murder of foreign officials)
- **1117** (conspiracy to murder)
- **1118** VCCLEA addition (murder in correctional institution)
- **1119** VCCLEA addition (foreign murder of US national)
- **1120** VCCLEA addition (murder by escaped prisoner)
- **1121** VCCLEA addition (murder by state or local officer)
- **1201** (kidnapping)
- **1203** (hostage taking)
- **1204** (international parental kidnapping)
- **1364** (interference by foreign commerce by violence)
- **1365** (tampering with consumer products) **except 1365(b),(c)**
- **1512(a)** (killing witness or victim)
- **1513** (retaliation against witness or victim)
- **1581** (peonage)

- **1583** (enticement into slavery)
- **1584** (sale into servitude)
- **1585** (slave trading)
- **1587** (possession of slaves aboard a vessel)
- **1588** (transporting slaves)
- **1651** (piracy)
- **1652** (citizens as pirates)
- **1653** (aliens as pirates)
- **1655** (assault on commander as pirates)
- **1659** (attack to plunder a vessel)
- **1661** (robbery ashore)
- **1751** (assassination of president or staff)
- **1792** (mutiny or riot)
- **1859** (surveys interrupted)
- **1864** (hazardous devices on federal lands)
- **1958** (use of interstate commerce in murder for hire)
- **1959** (violent crimes aiding racketeering)
- **1991** (entering train to commit crime)
- **1992** (wrecking trains)
- **2101** (riots)
- **2111** (special maritime jurisdiction)
- **2113(d),(e)** (bank robbery and incidental crimes)
- **2114** (assault of person carrying mail)
- **2115** (breaking into post office)
- **2118(a),(b),(c)** (robberies and burglaries involving controlled substances)
- **2119** (crimes involving motor vehicles)
- **2191** (cruelty to seamen)
- **2231(b)** (assault or resistance)
- **2232(a)** (destruction of property to prevent seizure)
- **2233** (rescue of seized property)
- **2241** (aggravated sexual abuse)
- **2242** (sexual abuse)
- **2244(a)** (abusive sexual contact)
- **2261** VCCLEA addition (interstate domestic violence)
- **2275** (firing or tampering with vessels)
- **2276** (breaking and entering vessels)
- **2280** VCCLEA addition (violence against maritime navigation)
- **2281(NOT (A)),** VCCLEA addition (violence against fixed platforms)
- **2332** (penalties for homicide)
- **2332a** VCCLEA addition (use of weapons of mass destruction)
- **2340A** (torture)
- **2383** (rebellion or insurrection)
- **2384** (sedition conspiracy)
- **2385** (advocating the overthrow of the government)
- **2389** (recruiting for service against U.S.)
- **2390** (enlistment to serve against U.S.)

P.S. 5162.02
CN-01, April 23, 1996
Page 5

- ♦ **2421**   (transportation for illegal sexual activity)
- ♦ **2422**   (coercion into interstate travel for illegal sexual activity)
- ♦ **2423**   (transportation of minors for illegal sexual activity)

b.  Title 21 United States Code Sections

- ♦ **841(e)**  (boobytraps on federal property)
- ♦ **848(e)**  (death penalty for criminal offenses)
- ♦ **858**   (endangering human life while manufacturing controlled substances)

c.  Title 26 United States Code Sections

- ♦ **5861(a)-(l)**  (firearms)

d.  Title 42 United States Code Sections

- ♦ **2283(a)**  (protection of nuclear inspectors)
- ♦ **2284(a)**  (sabotage of nuclear facilities)
- ♦ **3631**   (interference with housing)

e.  Title 49 United States Code Sections

- ♦ **46502**   (aircraft piracy)
- ♦ **46504**   (interference with flight crew members)
- ♦ **46505(c)** (carrying a weapon on an aircraft)
- ♦ **46507**   (false information and threats)

8.  CRIMINAL OFFENSES THAT MAY BE CRIMES OF VIOLENCE DEPENDING ON THE BASE OFFENSE LEVEL ASSIGNED.  Convictions for an offense listed below may or may not have involved the use, attempted use, or threat of force, or presented the substantial risk that force might be used against the person or property of another.  At the time of sentencing, the court makes a finding if an offense listed below involved violence, and this finding is reflected in the Presentence Investigation Report section entitled "Offense Computation," subsection entitled "Base Offense Level."  This subsection references a particular United States Sentencing Guideline provision that distinguishes between violations of the particular criminal code section that are committed with and without force.

> Example:  Title 18 United States Code Section 241, Conspiracy Against Rights provides:
>
> If two or more persons conspire to injure, oppress, threaten or intimidate any inhabitant . . .

. in the free exercise or enjoyment of any right or
privilege . . . .

This crime could be committed through the use of force or threat
of use of force, or not, since one can be oppressed through means
other than force.  Pursuant to United States Sentencing Guideline
Section 2H2.1, if the crime involved obstructing an election or
registration and the obstruction occurred using force or threat
of force against persons or property, the base offense level is
18.  If the obstruction occurred through non-violent means, such
as forgery, fraud, theft, deceit, etc., the base offense level is
12.  If an offender was convicted of an offense listed below,
case management staff must examine the base offense level to
determine whether the offense was a crime of violence.  If the
Presentence Investigation Report does not include an explanation
as to the reason for assigning a particular base offense level,
case management staff may need to examine the particular
Sentencing Guideline referenced.

Some of the offenses listed below may correspond to more than one
Sentencing Guideline, only one of which includes a base level
adjustment for violence.  Accordingly, it is possible that an
examination of the Offense Computation section of the Presentence
Investigation Report may reveal no mention of violence.  When the
Presentence Investigation Report fails to explain the reason for
assigning a particular base offense level, case management staff
must examine the particular Sentencing Guideline referenced to
determine whether the court found that the use of force was
implicated in the offense.

A list of offenses for which the Sentencing Guidelines base
offense level is affected by the presence of violence follows:

Title 18 United States Code Sections

- **33** (destruction of motor vehicles or facilities)
- **241** FOR OTHER THAN CONSPIRACY (conspiracy against rights)
- **242** (deprivation of rights under color of law)
- **592** (putting troops at polls)
- **593** (interference by armed forces)
- **1791** (possessing contraband in prison)
- **1952** (transporting items in aid of racketeering)
- **\*2116** (railway or steamboat post office)
- **2231(a)** (assault on persons executing search warrant)
- **2381** (treason)

9. CRIMINAL OFFENSES THAT MAY BE CRIMES OF VIOLENCE DEPENDING ON
THE SPECIFIC OFFENSE CHARACTERISTIC ASSIGNED.  Convictions for an
offense listed below, like those listed in Section 8 above, may

or may not meet the crime of violence definition by involving the use, attempted use, or threatened use of force, or by presenting a substantial risk that force might be used against the person or property of another. At the time of sentencing, the court makes a finding if the offense involved violence, and this finding is reflected in the Presentence Investigation Report section entitled "Offense Computation," under the subsection entitled "Specific Offense Characteristics." This subsection references a particular United States Sentencing Guideline that provides for an increase in the Total Offense Level if the criminal violation was committed with force.

\* Example: Section 841 of Title 21 United States Code makes it a \* crime to manufacture, distribute, or possess with the intent to distribute drugs. Under the Sentencing Guidelines (§ 2D1.1 and § 2D1.11) the defendant could receive an increase in his or her base offense level because of a "Specific Offense Characteristic," e.g., if a dangerous weapon was possessed during commission of the offense, the court would increase the defendant's base offense level by 2 levels. This particular "Specific Offense Characteristic" (possession of a dangerous weapon during the commission of a drug offense) poses a substantial risk that force may be used against persons or property. Accordingly, a defendant who has received a conviction for manufacturing drugs,(21 U.S.C. § 841) and receives a two level enhancement for possession of a firearm has been convicted
\* of a "crime of violence."                                              \*

Some of the offenses listed below may correspond to more than one Sentencing Guideline, only one of which includes a Specific Offense Characteristic for violence. Alternatively, the Presentence Investigation Report may fail to adequately describe the Specific Offense Characteristic that underlies the increase in offense level. In either case, it is possible that an examination of the Offense Computation section of the Presentence Investigation Report reveals no mention of violence. If this occurs, case management staff must examine the particular Sentencing Guideline referenced to determine whether the court found that the use of force was implicated in the offense.

Example: The Presentence Investigation Report in the above scenario may state "SOC (specific offense characteristic) 2F1.1(4) increase 2 levels." If the Report does not further state "since the offense involved the conscious or reckless risk of serious bodily injury, increase by two levels pursuant to 2F1.1(4)," the case management staff may have to examine Guideline 2F1.1(4) to determine that the only basis for this particular increase is a finding that the offense included the risk of bodily injury.

P.S. 5162.02
CN-01, April 23, 1996
Page 8

Case management staff may contact Regional Counsel if they have questions regarding this section. Below is a list of offenses for which there could be a Specific Offense Characteristic enhancement for the use of violence:

a.  Title 16 United States Code Sections

- ◆ **773e(a)(2),(3),(4),(6)** (violation of Northern Pacific Halibut Act)
- ◆ **773g** (violation of Northern Pacific Halibut Act)
- ◆ **1857(a)(D),(E),(F),(H)** (violation of National Fishery Management Program)
- ◆ **1859** (violation of National Fishery Management Program)
- ◆ **2435(4),(5),(6),(7)** (violation of Antarctic Marine Living Resources Convention)
- ◆ **2438** (violation of Antarctic Marine Living Resources Convention)
- ◆ **3606** (violation of North Atlantic Salmon Fishing)
- ◆ **3637(a)(2),(3),(4),(6),(c)** (violation of Pacific Salmon Fishing)
- ◆ **5009(5),(6),(7),(8)** (violation of North Pacific Anadromous Stock Convention)
- ◆ **5010(b)** (violation of North Pacific Anadromous Stock Convention)

b.  Title 18 United States Code Sections

- ◆ **755** (officer permitting escape)
- ◆ **757** (procures escape for prisoner of war)
- ◆ **874** (kickbacks from public works employees)
- ◆ **894** (extending credit through extortionate means)
- ◆ **1163** (embezzlement/theft from Indian organizations)
- ◆ **1503** (influencing or injuring officer or juror)
- ◆ **1505** (obstruction of proceedings before departments or agencies)
- ◆ **1511** (obstruction of state or local law enforcement)
- ◆ **1516** (obstruction of a federal audit)
- ◆ **1517** (obstructing financial examination)
- ◆ **1951** (interference with commerce by threats or violence)
- ◆ **2112** (robbery of personal property of United States)
- ◆ **\*2116** (breaking into a mail car)

c.  Title 21 United States Code Sections

- ◆ **841(NOT (e)),** (controlled substance violation)
- ◆ **\*846** (attempt and conspiracy)

d.  Title 26 United States Code Sections

   ♦ **7212** (attempt to interfere with revenue laws)
   ♦ **7214** (unlawful acts by employees of the IRS)

e.  Title 30 United States Code Sections

   ♦ **1461(a)(3),(4),(5),(7)** (resisting officers for violations under Deep Seabed Mineral Resources Act)
   ♦ **1463**    (violations of Deep Seabed Mineral Resources Act)

f.  Title 33 United States Code Section

   ♦ **1232(b)(2)** (ports and waterways safety enforcement provisions)

g.  Title 40 United States Code Section

   ♦ **193f(a)** (security of Capitol grounds and buildings)

h.  Title 42 United States Code Sections

   ♦ **1973aa** (application of prohibition to other States)
   ♦ **1973aa-1** (residence requirements for voting)
   ♦ **1973aa-1a** (bilingual election requirements)
   ♦ **1973aa-3** (penalty)
   ♦ **1973bb** (enforcement of twenty-sixth amendment)
   ♦ **1973gg-10** (criminal penalties)
   ♦ **2283(b)** (protection of nuclear inspectors)
   ♦ **19151(2),(3),(4),(5)** (violation of Ocean Thermal Energy Conversion Act)
   ♦ **9152(d)** (violation of Ocean Thermal Energy Conversion Act)

i. Title 46 United States Code Section

   ♦ **1903**    (Manufacture, Distribution, or possession with intent to manufacture controlled substances)

j.  Title 49 United States Code Section

   ♦ **46505(b)** (carrying a weapon on an aircraft)

10.  CRIMINAL OFFENSES THAT MAY BE CRIMES OF VIOLENCE DEPENDING ON A VARIETY OF FACTORS.  In addition to the two lists in Sections 8 and 9 above, there are several more code sections that can be violated with or without force.  For the crimes listed below, the Sentencing Guidelines provide little insight into the court's findings on this issue.  Accordingly, rather than simply examining the base offense level or the specific

offense characteristics, case managers must carefully examine the entire Offense Computation section of the Presentence Investigation Report, and, if necessary, the Offense Conduct section, to determine whether the offense was violent.

For the sections listed below, staff should look carefully to see if the offense was committed through the use or threatened use of force against a person or property, or whether commission of the offense involved a substantial risk that force would be used against a person or property.

*   Some of the statutes listed in this section cover conspiracy   *
    offenses, (see, e.g., 18 U.S.C. § 371 and 21 U.S.C. § 846) where
    an individual has planned with others to commit a particular
    crime.  Other listed statutes cover attempt offenses (see, e.g.,
    21 U.S.C. §§ 846 and 963) where an individual tried but did not
    succeed in committing a particular crime.  In order to determine
    whether one these offenses is violent, it is necessary to examine
    the "underlying offense" (what the defendant was conspiring to do
    or attempting to do).  If the underlying offense would be
    classified as violent pursuant to the provisions of this program
    statement, e.g., murder, then the attempt or the conspiracy
    offense is also violent.  The underlying offense may be noted on
    the Judgment and Commitment Order and will certainly be included
    in the Presentence Investigation Report.

    Example:  The Judgment and Commitment Order may indicate a
    conviction for "Attempt and Conspiracy)" (21 U.S.C. § 846).
    The accompanying Presentence Investigation Report will
    reference the underlying crime, in many cases it will be
    "Possession with Intent to Distribute a Controlled
    Substance" (21 U.S.C. § 841).  Staff should then review the
    underlying offense (in this case possession of controlled
    substance) using the categories in this program statement.
    As noted in the example on Section 9, if the Presentence
    Report indicates that the defendant received a 2 level
    increase for possessing a dangerous weapon ("Specific
    Offense Characteristic" for guideline § 2D1.1 or 2D1.11
    applicable to 21 U.S.C. § 841 violations), then the offense
    should be deemed violent; if no such enhancement was given,
    the offense should be deemed nonviolent.

There are some statutes that do not criminalize behavior, but rather set out penalties that will result from violating other statutes.

    Example:  18 U.S.C. § 924(a)(1)(B) provides that whoever
    "knowingly violates subsection (a)(4), (f), (k), (r),
    (v), or (w) of section 922 . . . shall be fined under

P.S. 5162.02
CN-01, April 23, 1996
Page 11

this title, imprisoned not more than five years, or both."

The Judgment and Commitment Order may indicate the sentence was imposed pursuant to the penalty provisions of § 924(a)(1)(B) without indicating the conviction for the underlying offense. The PSI, however, will note the underlying conviction, e.g., "Transporting a Destructive Device in Interstate Commerce" (18 U.S.C. § 922(a)(4)). In order to determine whether the offender's current offense is violent, staff should assess whether the underlying offense is violent in accordance with the provisions of this policy; if the underlying offense is violent, then the offender should be deemed violent.

Below is a list of offenses that may be violent depending on a variety of factors.

a. Title 7 United States Code Section

♦ **473c-1** (offenses in relation to sampling of cotton)

b. Title 16 United States Code Sections

♦ **5106(e)(5),(6),(7),(9),(f)(2)** (violation of Atlantic Coast Fisheries Cooperative Management)

c. Title 18 United States Code Sections

♦ **241** <u>if conspiracy</u> (conspiracy to deprive of civil rights)
♦ **371** (conspiracy to commit offense or fraud against United States)
♦ **372** (conspiracy to impede or inure officer)
♦ **700** (desecration of the flag of the United States)
♦ **751** (escape from federal prison)
♦ **752** (instigating or assisting escape from federal prison)
♦ **831** (prohibited acts involving nuclear materials)
♦ **876** (mailing threatening communications)
♦ **877** (mailing threatening communications from foreign country)
♦ **924** (penalties for firearms violations)
♦ **1153** (offenses within Indian Country)
♦ **1512(b)** (tampering with a witness/victim/informant)
♦ **1708** (theft or receipt of stolen mail)
♦ **1792** (mutiny and riot in prison)
♦ **1956** (money laundering)
♦ **1962** (racketeering)
♦ **2117** (breaking into carrier facilities)
♦ **2118(d)** (robberies involving controlled substances)

- ♦ **2152** (destruction of submarine and torpedo works)
- ♦ **2153** (destruction of war materials)
- ♦ **2154** (production of defective war material)
- ♦ **2155** (destruction of national defense materials)
- ♦ **2156** (production of defective national defense material)
- ♦ **2192** (incitation of seamen to revolt)
- ♦ **2193** (mutiny)
- ♦ **2247** (repeat offenders)
- ♦ **2387** (activities involving armed forces)

d. Title 21 United States Code Sections

- ♦ **\*846** (attempt and conspiracy)
- ♦ **848** (controlled substances violations as criminal enterprise)
- ♦ **963** (conspiracy or attempt to violate controlled substance laws)

e. Title 40 United States Code Sections

- ♦ **193f(a),(b)** (security of Capitol grounds and buildings)

f. Title 42 United States Code Section

- ♦ **2000(e)(13)** (killing of officer while enforcing Equal Employment Act)

11. TITLE 18 UNITED STATES CODE SECTION 2113(a).

Title 18 United States Code Section 2113(a) provides in pertinent part:

> Whoever, by force and violence, or by intimidation, takes or attempts to take, from the person or presence of another, or obtains or attempts to obtain by extortion any property or money or any other thing of value belonging to, or in the care, custody, control, management, or possession of, any bank, credit union, or any savings and loan association; . . . shall be fined under this title or imprisoned not more than twenty years, or both.

This statute covers various offenses, including not only bank robbery, but embezzling bank funds, stealing bank property and bank larceny.

P.S. 5162.02
CN-01, April 23, 1996
Page 13

With regard to the specific crime of bank robbery, the offense should be considered a crime of violence pursuant to section 924(c)(3) since, due to the circumstances surrounding bank robberies, the offense involves an explicit or implicit threat of force and thus has as an element the "threatened use of physical force against the person or property of another."

However, as to other offenses covered by 18 U.S.C. § 2113(a), (e.g. bank larceny), similar to offenses in Section 9, defendants may receive a Specific Offense Characteristic enhancement that will result in an increase in the base offense level.  Such enhancements provide for an increase in the defendant's base offense level if a firearm was discharged, if a firearm or other dangerous weapon was brandished, displayed, possessed or used or if an express or implied threat of death was made (U.S.S.G. 2B3.2(b), Application Notes 2 and 6).  If a defendant received such an enhancement (or one of the other enhancements involving violence), the crime should be deemed "violent."

12.  <u>OFFENSES COMMITTED BEFORE NOVEMBER 1, 1987</u>.  The Sentencing Guidelines are, generally, not applicable for offenses committed before November 1, 1987.  Accordingly, for offenses identified in sections 8 through 10 above that were committed before this date, case managers must make their own determination, based on the narrative description of the crime contained in the Presentence Investigation Report, whether the crime has as an element the use of force or threat of force, or the offense, by its nature, posed a substantial risk that force would be used (see definition in 18 U.S.C. § 924(c)(3) quoted above).

13.  <u>CRIMES CODIFIED PURSUANT TO THE VIOLENT CRIME CONTROL AND LAW ENFORCEMENT ACT OF 1994</u>.  The VCCLEA created a number of new Federal criminal offenses and enhanced penalties for several existing offenses. Some of the new offenses are included in the above lists, but the lists will be revised as needed after the United States Sentencing Commission drafts new guidelines.  The above lists will be updated periodically to reflect legislative changes.

\s\
Kathleen M. Hawk
Director